Pennsylvania Power & Light Company, Appellant,
v. Public Service Commission et al.

198

Argued March 15, 1937.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Seth T. McCormick, Jr.*, with him *Edmund G. Hauff, Charles K. Robinson* and *Thos. J. Perkins,* for appellant.

*John C. Kelley,* with him *Harry H. Frank, Samuel Graff Miller* and *Richard J. Beamish,* for appellee.

*Harold Evans,* of *MacCoy, Brittain, Evans & Lewis,* with him *Frank P. Cummings,* City Solicitor, for intervenor.

OPINION BY PARKER, J., July 15, 1937:

This is an appeal by the Pennsylvania Power & Light Company from orders of the Public Service Commission in a proceeding instituted by the city of Williamsport and others on complaints alleging that appellant's rates were excessive and unreasonable. We are all of the opinion that the case cannot and ought not to be finally disposed of on the record as it now stands, and that for three principal reasons. While this appeal was pending and before it could be disposed of, radical changes were made by the legislature in the public utility laws concerning procedure on appeals to this court and particularly affecting the scope of our inquiry. The parties are entitled to, present their arguments on the basis of the present law. Certain of the commission's findings and conclusions are not sustained by the evidence. The commission should have gone farther than it did in the order from which this appeal was taken and either have prescribed a tariff or have indicated at least the average price which the respondent is entitled to charge for natural gas.

Recognizing the unavoidable delays which prolong the periods of litigation to a matter of years in cases of this nature, and to the end that there may be a minimum of delay, we will discuss what we regard as vital questions, the proper determination of which is essential to a final order.

1. Shortly after this appeal was argued, the Act of July 26, 1913, P. L. 1374 (66 PS), known as the Public Service Company Law, with its supplements and amend-

ments, was replaced by the Act of May 28, 1937, P. L. 1053, effective June 1, 1937. We will refer to these statutes as the old and the new law. By the old law as amended by Act of June 12, 1931, P. L. 530 (66 PS 836), it was required that on an appeal this "court shall, upon the record certified to it by the commission, determine whether or not the order appealed from is reasonable and in conformity with law: Provided, however, That in every appeal taken......involving a question of the reasonableness of rates......it shall be the duty of the court to consider the entire record of the proceedings before the commission, including the testimony, and, on its own independent judgment, to determine whether or not the findings made and the valuations and rates fixed by the commission are reasonable and proper." By §1107 of the new law, designated as the "Public Utility Law," it is provided that in case of appeals to this court, "the order of the commission shall not be vacated or set aside either in whole or in part except for error of law or lack of evidence to support the finding, determination, or order of the commission or violation of constitutional rights."

This appeal involves the reasonableness of rates and in such matters the new law makes a radical change in the scope of the inquiry by this court, limiting our inquiry to matters of law and thereby placing appeals involving a question of reasonableness of rates on the same basis as other appeals.

The change is procedural and affects pending litigation insofar as it is possible to conform to and give effect to the change in the law. " 'Legislation which affects rights will not be construed to be retroactive unless it is declared so in the act. But where it concerns merely the mode of procedure, it is applied, as of course, to litigation existing at the time of its passage...... Procedure is a matter of statutory regulation, and, unless prevented by the Constitution, the legislature may

alter it at will, provided the obligations of contracts are not impaired; but where the remedy is not entirely taken away, and the scope of the powers or duties of the hearing tribunals are merely enlarged, no contract is impaired'; *Kuca v. Lehigh Valley Coal Co.*, 268 Pa. 163, 166, 110 A. 731. Also, see *Kille v. Reading Iron Wks.*, 134 Pa. 225, 19 A. 547; *Lane v. White*, 140 Pa. 99, 101, 21 A. 437. In *Long's Appeal*, 87 Pa. 114, the litigation was between individuals and the Pennsylvania Railroad Company. It was held that a change in legislation whereby an appeal was given did not affect substantive rights since it was a mere change in remedy and did not affect vested rights": *Kunze v. Duquesne City*, 126 Pa. Superior Ct. 43, 47, 190 A. 538.

It is therefore apparent that there is a different question presented for our determination than that discussed by the parties in their oral arguments and briefs, and they are entitled to be heard on the matters now for consideration, to wit, whether the findings are supported by competent evidence, whether the law has been properly applied, and whether any constitutional rights are violated.

2. Before indicating the additional findings that should be made, we will consider the report of the commission and point out certain vital matters wherein we believe there is error, in that the findings and conclusions are not in conformity with law or are not supported by the evidence. For many years the respondent and its predecessors have been supplying manufactured gas in the Williamsport metropolitan area and also in territory as far east as Bloomsburg. It operated a number of plants for the manufacture of gas and supplied gas from Williamsport on the west to Sunbury and Selinsgrove on the east and south through a connected system. It maintained fifty-four miles of transmission lines and two hundred twelve miles of distribution mains. The manufactured gas supplied had a heating

value content of 520 British thermal units per cubic foot. Natural gas was not available to consumers in the areas supplied by the respondent until 1930 when gas was discovered by prospectors in Tioga County, at a location about fifty miles north of Williamsport. This field produced gas in considerable quantities from what is known as the Oriskany sand, and later developments have extended the field of production to counties east of Tioga in Pennsylvania and adjoining counties in southern New York.

During 1931, the respondent caused to be organized a corporation known as North Branch Development Company for the purpose of prospecting for and producing natural gas. This subsidiary acquired approximately sixty thousand acres of prospective territory in the Tioga field and developed several producing wells with an initial open flow production of 21.5 million cubic feet daily. The development company also contracted for the purchase of gas from other producers and in turn contracted with the paramount company, the respondent, for a supply of gas.

The respondent also caused to be organized a transportation company known as the Susquehanna Gas Company, organized under the Natural Gas Act. That subsidiary constructed a fourteen-inch transmission line approximately fifty-five miles in length, extending from the Tioga field to East Montoursville, near Williamsport, which latter point we will refer to as the "main gate" to the area of consumption. It also constructed and installed gathering lines and then contracted with the parent company to transport gas from the field to East Montoursville. The natural gas produced in the Oriskany sand had a heating value content of approximately 1020 British thermal units. The properties of both of these companies are but arms of the respondent and are affected with a public interest.

The respondent having determined to supply its con-

sumers with natural gas in place of manufactured gas filed new tariffs; that for the Williamsport metropolitan area was known as P. S. C. Pa. No. 35 and Supplement No. 1, and fixed the rate to consumers in private homes at $1 per month for the first 200 cubic feet whether consumed or not (or at the rate of $5 per M. cu. ft.), $2 per M. for the next 1.3 M. cu. ft., and $1.60 per M. for all in excess of 1.5 M. cu. ft. per month. It also provided a lower rate for gas used by domestic consumers for house heating by separate meter. The tariffs fixed the price of the commodity in terms of therms, a therm representing the heating value expressed by 100,000 British thermal units. For convenience and clarity we have translated therms into cubic feet, assuming natural gas to contain 1,000 British thermal units per cubic foot as prescribed by the tariffs. In fact, the gas is metered to consumers by the cubic foot and not by therm. Another tariff covered an area farther from the source of supply and fixed rates somewhat higher for the portion of the Williamsport operating division outside of metropolitan Williamsport. The commission dismissed that part of the complaint which alleged that this difference in rates was discriminatory and that complaint is not now involved in this appeal. The tariffs in question effected a reduction to consumers of 18.4 per cent, taking into account the fact that the heating value of the natural gas supplied was approximately twice that of the manufactured gas formerly supplied. When the company was ready to supply natural gas, it at its own expense spent approximately $175,-000 in adjusting the consumers' appliances for the use of natural gas.

On August 3, 1936, the commission filed its report which included findings as to the fair value of the property used and deemed by the commission to be useful in the respondent's business, estimates of operating expenses and other items affecting gross and net allowable

revenues, and then fixed the gross annual operating revenue in the Williamsport operating division at $346,234 for the period from April 1, 1931, to April 1, 1934; at $332,184 for the period from April 2, 1934, to December 31, 1934; and at $334,584 for the years 1935 and 1936. It then ordered the respondent to file tariffs calculated to yield such revenue. The report and order did not provide a proper tariff or fix the average price per thousand cubic feet or per therm, which the utility was entitled to charge for the natural gas sold, or determine how the price should vary in proportion to the amount of gas consumed by the respective customers or what allowance should be made by way of a ready to serve charge.

In fixing the gross annual allowable return which the utility was entitled to receive, the commission did not depend upon the fair value of all the property which the utility had dedicated to public use and which it is alleged was used and useful in the public service. What it did was to divide the property and facilities of the respondent into two classes, to wit, (a) the property and facilities used and useful in procuring natural gas, and (b) the property and facilities used in the distribution of the gas after it reached the main gate at the entrance to the area where gas is supplied to consumers. In other words, it treated in a different manner the property used in producing and transporting a supply of natural gas to the main gate than that used in the distribution of the gas after it reached that point. To comprehend the commission's position and reach a correct conclusion on all the questions involved, this classification must be kept in mind.

The appraisements having to do with the distribution system followed the conventional plan of fixing a fair value for the facilities and determining the probable expense to the company of supplying the commodity. The commission, in determining a fair return for the

production and transportation of gas to the main gate, examined the claims of the respondent and demonstrated, as we believe, that the respondent's valuations of property used and useful in the production and transportation of gas were so high that they could not be sustained. This would seem to indicate either bad management, unreasonable investments, or other conditions which should not be charged to the consumer. The commission, therefore, excluded from fair value all investments in the producing section and in the fourteen-inch line leading to the main gate and fixed a price of twenty-five cents per M. as the cost of gas to the respondent at the gate, which sum was to be allowed as an operating cost.

There are essential differences in the arts of producing and supplying manufactured and natural gas. The two commodities vary in their heating value, are adapted to different uses, and require different adjustments of the burners of the consumers. The present market for manufactured gas is largely for cooking purposes, hot water heating, refrigeration, and room heating for short intervals. While natural gas is adapted to these uses, it finds its principal economic use in furnishing heat for homes by reason of its higher heating value, convenience, and lower cost. It can compete with coal and oil for house heating where the price charged is not too high. In fact, it appears by the uncontradicted evidence in the record that throughout Pennsylvania where natural gas is used the bulk of the commodity is employed for house heating or certain industrial purposes to which it is especially adapted. Its market is broader than that for manufactured gas if and when it can be supplied at lower cost. The one, as its name indicates, is manufactured and the other is furnished by nature. Consequently, natural gas must be transported considerable distances from the wells to points of consumption, which is not true of manu-

factured gas. The means and facilities employed in securing a supply are different with each.

The respondent has definitely, by reason of a large expenditure of money, committed itself to the furnishing of natural gas and must be governed by principles applicable to such business. The main responsibility for the predicament in which respondent finds itself—it is a serious one—is due to an attempt to apply the responsibilities and the returns of a manufactured gas company to a natural gas company. However, it contends that it is equipped to supply natural gas and if it is, it should be and is entitled to be governed by the rules and practices prevailing in the natural gas industry. If it should eventuate that respondent cannot perform the functions of a natural gas company by reason of inability to secure gas, that situation will then have to be met and on a different basis. For the present we are entitled to deal with the respondent as a company supplying natural gas.

This brings us to a consideration of certain important items wherein we believe the findings and conclusions of the commission are not supported by the record. We will consider such matters in the light of the new law and examine the report of the commission for errors of law. As the law now stands, the findings of the commission are conclusive if supported by substantial evidence, "unless there was some irregularity in the proceeding or some error in the application of the rules of law." (*Western Paper Makers' Chemical Co. v. U. S.,* 271 U. S. 268, 46 S. Ct. 500.) The arguments were based upon the old law, and counsel have not been heard on the law as it now is. However, to avoid delay we have deemed it advisable to express an opinion on a number of controverted questions without prejudice to the parties to be heard later if it is so desired.

We might say, parenthetically, that assignments of error 3, 4 and 131 complain of the action of the com-

mission in taking the Williamsport operating division as the rate making unit and in not including the remainder of the territory supplied by respondent. We find no merit in this contention for the commission has sustained its position in this respect by numerous authorities. This was a matter within the sound discretion of the commission. See *Wabash Valley Elec. Co. v. Young,* 287 U. S. 488, 53 S. Ct. 234; *Scranton-Spring Brook W. S. Co. v. P. S. C.,* 105 Pa. Superior Ct. 203, 226, 160 A. 230.

*City-Gate Price:* Assignments of error 6, 8-11, and 14-18, complain of the action of the commission in establishing a price of twenty-five cents per M. for gas delivered at the main gate and in refusing to take into account the actual cost of producing gas.

As we have pointed out, the commission discarded from consideration cost or fair value of property invested in producing a supply of natural gas, gave some weight to the investment in the fourteen-inch main line, and fixed twenty-five cents per M. as the cost of gas to the respondent at the main gate. It predicated that price on a cost of transportation and gathering of nine and one-half cents per M. and found that a supply of gas could be secured in the field at twelve cents per M. by purchase from other producers. The respondent's evidence tended to show that for the year ending June 30, 1933, the actual cost to the respondent of producing natural gas and of gas purchased, and the cost of delivering the supply at the main gate at East Montoursville was $1.02 per M. In 1933, the North Branch Development Company produced about 267,000 M. cubic feet from its own wells; and purchased from other producers about 162,000 M. cubic feet at a cost of approximately twelve cents per M. at the wells. There was also evidence showing that gas was purchased by other utilities in the same area on approximately the same terms. There was no evidence that the respond-

ent could supply all its requirements by such purchases for the year 1933, much less so for future years. The commission allowed a cost for gathering and transportation to the main gate of nine and one-half cents per M. and, after allowing for leakage, fixed a main gate price of twenty-five cents per M.

We cannot say that the cost fixed for transportation was not sustained by competent evidence. It would unduly extend this opinion to enter into a discussion of all the figures involved in the investment in the main line. Suffice it to say that the weight of the credible evidence supports the conclusion of the commission that the investments in and construction of a fourteen-inch line were not provident or prudent and that the mistakes of management were such that they should not be borne by the consumers. Respondent sought to justify the building of a line of this size on the theory that it would avoid the construction of a booster station and furnish a reservoir of gas in an emergency. There is ample evidence, however, to support the conclusion of the commission that the plan adopted was contrary to well established and prudent practice. As the pressure in the field wanes, booster pumps prolong the life of an available supply and a ten-inch line would have been ample. The respondent has provided no pumping system which eventually will be a necessity. Not only so, but there is evidence tending to show that the line constructed is larger than would be required if the respondent increased its sale of gas to the so-called "saturation point." It must be borne in mind that the respondent had to have a line of its own in order to get the gas from the field to the main gate. We cannot say that the commission did not attempt to make some allowance for such investment by fixing the cost of gas at the main gate at twenty-five cents per M.

On the other hand, we cannot discover in the record any evidence that will support a finding that the re-

spondent could purchase a dependable supply of gas necessary to meet its needs at twelve cents per M. at the wells or at a figure approximating that price. While some considerable gas could be purchased in 1933 or 1934 at about the price indicated, there is no evidence that gas can in a few years be purchased at that price or that it will then be available even at a higher price. The record is void of evidence that will even support an inference that it can so secure an adequate supply. This was a new field and the evidence was that the productive and profitable life of these wells is about five years. If this field fails or the production wanes, the evidence clearly indicates that respondent will have to look to more distant points for a source of supply. This will require the building of additional lines and the installation of a pumping system. Many large companies are drawing on this reservoir, each anxious to reduce the supply to possession before it is exhausted. Some investment in productive acreage, as well as prospective territory, was an absolute essential to the wise administration of the affairs of this company.

It would be the height of folly for respondent to depend alone on gas purchased from others, unless it could contract with a strong company which had available extensive reserves. Not only so, but the contracts that have been available are such as appear in every new field.

A consideration of the physical properties and geological distribution of natural gas when considered with the facts in the record will support our conclusion. Here, the bulk of the proven acreage is held by large companies who market their own product directly to consumers. The books are full of cases showing the "fugitive" nature of oil, and particularly, gas. This gas comes from wells in new producing fields at high pressure with the result that one well will in time drain a wide area and reduce the pressure. Natural gas in the

earth "is not the subject of property except while in actual occupancy" (*Dark v. Johnston,* 55 Pa. 164, 168), and has the power and tendency to escape from the land of one person to that of another. The land owner has no ownership in it except for such time as it is in his land and under his control. The result is a scramble between adjoining owners to reduce the gas to possession. It is also frequently the case that when a new field is opened, as here, the pioneer is not able to tie up a solid block of land, and small lots are secured by individuals. In such case one may from an acre lot or less secure the proportion of gas naturally underlying many acres. It is not practicable to store it and, as a consequence, in the effort of each to get the greater share it is sold for much less at times than its real value. The result is that in new fields there is for a short time a moderate amount of so-called "surplus" or "distress" gas for sale at low prices. A natural gas company undertaking to supply the public could not depend on such a source for its commodity. This company followed the only reasonable course in securing some gas upon which it could depend before making a large investment.

"A public service company, as any other company, has the right to manage its own affairs to the fullest extent consistent with the public interest and insofar as it does not act contrary to law": *Hostetter v. P. S. C.,* 110 Pa. Superior Ct. 212, 220, 168 A. 493; *Coplay Cement Mfg. Co. v. P. S. C.,* 271 Pa. 58, 62, 114 A. 649. The company may manage its own affairs and neither the commission nor the court is authorized to interfere except for the special purposes mentioned in the Public Utility Law. The evidence in this case will not support a conclusion that the respondent, acting through its management in securing a dependable supply of gas by its own explorations, acted contrary to law.

It does not follow and we do not mean to say that

this company is entitled to a return upon all that it claims to have invested in the production of gas. Neither do we say that the commission should have excluded from consideration the fact that some gas could be procured for twelve cents per M. That was evidence to be taken into account with the other evidence in the record.

*Depreciation:* In its report the commission said: "In determining annual and accrued depreciation in the various elements of respondent's property, we shall adopt the age-life basis giving consideration to accrued depreciation as observed, and shall apply thereto the four per cent sinking fund method." The commission then applied the four per cent sinking fund method exclusively to both accrued and annual depreciation, ignoring all evidence as to the condition of the plant as shown by observation except in setting up a theoretical life for the parts of the plant. As applied to accrued depreciation, this was directly contrary to our decision in *Cheltenham & Abington S. Co. v. P. S. C.*, 122 Pa. Superior Ct. 252, 268, etc., 186 A. 149. When a new rate hearing is held, fair value is fixed as of the time that the order is made: *Willcox v. Cons. Gas. Co.*, 212 U. S. 19, 29 S. Ct. 192; *McCardle v. Indianapolis W. Co.*, 272 U. S. 400, 409, 47 S. Ct. 144; *Chambersburg Gas Co. v. P. S. C.*, 116 Pa. Superior Ct. 196, 176 A. 794. We cannot add anything to what we said in the Cheltenham & Abington case, supra, on this subject. The method pursued by the commission in this respect is not in conformity with law.

*Rate of Return:* Assignments of error 151, 167, 168 and 169 raise questions as to the rate of return allowed by the commission: In its report it said: "In view of our resolution, we are of the opinion that a six per cent rate of return is fair to respondent for rate making purposes after 1933." A return of seven per cent was allowed for the previous period.

The commission's findings in this respect are not in conformity with law and violate constitutional rights of the respondent. The United States Supreme Court, in the case of *Bluefield Water Works & I. Co. v. P. S. C.,* 262 U. S. 679, 692, 43 S. Ct. 675, 679, said: "What annual rate will constitute just compensation depends upon many circumstances and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts. A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally."

Again, in *United Rys. & E. Co. v. West,* 280 U. S. 234, 249, 251-252, 50 S. Ct. 123, that court said: "Nor can a rule be laid down which will apply uniformly to all sorts of utilities. What may be a fair return for one may be inadequate for another, depending upon circumstances, locality, and risk......It is manifest that just compensation for a utility, requiring for efficient public service skillful and prudent management as well as use of the plant, and whose rates are subject to public regulation, is more than current interest on mere

investment. Sound business management requires that, after paying all expenses of operation, setting aside the necessary sums for depreciation, payment of interest, and reasonable dividends, there should still remain something to be passed to the surplus account, and a rate of return which does not admit of that being done is not sufficient to assure confidence in the financial soundness of the utility to maintain its credit and enable it to raise money necessary for the proper discharge of its public duties. In this view of the matter, a return of 6.26 per cent, is clearly inadequate. In the light of recent decisions of this court and other federal decisions, it is not certain that rates securing a return of 7½ per cent., or even 8 per cent., on the value of the property would not be necessary to avoid confiscation. But this we do not decide, since the company itself sought from the commission a rate which it appears would produce a return of about 7.44 per cent., at the same time insisting that such return fell short of being adequate. Upon the present record, we are of opinion that to enforce rates producing less than this would be confiscatory and in violation of the due process clause of the Fourteenth Amendment."

The commission erred first in arbitrarily fixing the same rate for all utilities and, second, in fixing the rate without consideration of the risks and uncertainties involved. When the former commission based the allowable rate of return on a former resolution and ignored the facts in the case, it not only did not act in compliance with law but made a wide departure from a legal course. The rates at which "corporate loans are being currently refinanced" is not the criterion as clearly appears from the excerpts from the opinion of the Supreme Court of the United States. We do not need to look beyond the record to conclude that the risks and hazards of the business of the respondent are much greater than those of a water company. The rate allowable is

a fact to be determined from the evidence like any other fact, and not by a standing resolution. See *Pennsylvania Gas Co. v. P. S. C.*, 207 N. Y. S. 599; *Oklahoma Nat. Gas Co. v. Corp. Com.*, 90 Okla. 84, 216 P. 917, 923; In Re *Ashtabula Gas Co., P. U. R.* 1917 D 790, 795-796.

*Manufactured Gas Plant:* The appellant has filed a number of assignments of error that complain of the elimination from the rate base of the plant formerly used to manufacture gas and a part of the storage holder capacity. The commission allowed as part of the rate base one holder having a capacity of one million cubic feet and excluded two holders having a capacity of 600,000 cubic feet and also excluded in its entirety the plant used to manufacture gas. The holders had formerly been used when manufactured gas was furnished and were part of the usual equipment in such operations. The commission, in support of its conclusions, said: "Respondent has developed a natural gas source, and has made the change-over in consumers' equipment to meet the higher heating value of that gas as compared to the manufactured gas formerly served by it. Respondent is definitely relying on its source of natural gas, and the mere existence of the manufactured gas plant does not require its inclusion in a determination of proper rates, even for standby emergency service. Respondent, having decided to furnish its customers with natural gas, must so conduct itself that service from such source will continue uninterrupted, as the consumers should not be burdened with carrying the capital expense of two different sources of supply, that is natural gas and manufactured gas. If the plant were being reproduced, and natural gas adopted as the source of supply, manufactured gas plants would not also be constructed. We shall, therefore, exclude all of the manufactured gas plant at Mulberry Street, Williamsport, together with the relief holder at that site." It also stated that in eliminating the manufac-

tured gas plant it was "proceeding in accordance with principles" established in *Los Angeles G. & E. Corp. v. R. R. Comm.*, 289 U. S. 287, 53 S. Ct. 637. We find no support in that case for the position of the commission that no allowance should be made for the manufactured gas plant. In fact, we think the inferences to be drawn from the opinion are rather to the contrary. It also appeared that the Los Angeles utility had available an unusual supply of natural gas, sufficient to furnish a supply for many years. The commission states that the maximum daily consumption in the Williamsport area has been about one million cubic feet of gas, and they have allowed storage capacity for one day. That, of course, would only provide for a temporary interruption by reason of the breaking of a line.

The appellant advances two reasons in support of its claim for an allowance on this account, to wit, (a) to take care of temporary interruption of service by a breaking of the one line which transports the gas from the field to the main gate, and (b) as a source of supply to be used in the event of the failure or partial failure of a supply of natural gas by reason of the failure of the gas field or a serious decrease in its output.

The commission refers to the evidence in the record showing the experience of other companies demonstrating the rarity of interruption of service by reason of breaks in lines. All natural gas companies seem to be equipped with facilities and the necessary force to quickly repair such breaks as may occur from any but unusual circumstances. A flood of large proportions, which rarely occurs, or a cataclysm might well cause such interruption as would extend over a period of days, but it is at least doubtful whether a natural gas company would be warranted in maintaining a plant for manufacturing gas to meet such emergency. We conclude from the evidence that it is certainly not the general practice so to do. We are therefore not impressed

with that phase of the argument which relies on the necessity for maintaining a plant to provide against a break in a line.

As to the other argument, a more serious question is presented and one that has given us considerable trouble. It must be admitted that it is not the practice of those engaged in supplying natural gas to maintain an auxiliary plant for manufacturing gas, but we have here a somewhat different situation. The respondent has a plant equipped and ready on a few hours' notice to supply manufactured gas of a heating value of 800 British thermal units. Would a prudent, experienced operator junk such a plant under the circumstances? The utility is dependent at the present time, or at least was when the testimony was taken, upon wells drilled by it and the purchase of gas from other producers. The figures submitted indicate clearly that the production in the Tioga field has dropped considerably and that it will be necessary in the near future to look to more distant fields for a supply, which situation will require the construction of additional pumping plants, main lines, and gathering lines which the experience of this company shows is expensive. The commission finds in its report that the life of these wells is approximately five years. By this finding we assume that they mean to say that the production of gas in any considerable quantity is limited to five years.

It is primarily, as we have pointed out, the duty of the directors or managers of a corporation, even though it be a utility, to determine the policy of the company, and that policy should not be interfered with or ignored in the determining of a rate base unless there is shown improvidence or other bad management upon the part of such officers. We therefore approach the subject with the presumptions that are in favor of the proper exercise of the duties of those charged with the management of a company. The question for the commis-

sion and for this court is therefore whether there is evidence from which it may be concluded that good management will require this company at this time to junk its manufactured gas plant. We do not believe the records will support a conclusion that the directors in this respect were wasteful or improvident. What value should be allowed is a different question. At the same time, this is a matter to be taken into account in reaching the ultimate question as to what is a fair rate to be charged to consumers, a subject which we will next discuss.

3. The primary question for the commission in this case is whether the rates prescribed by the respondent's tariffs are fair and reasonable. If, in answering this question, it is found that the rates are too high, the commission must then necessarily either indicate a proper charge or furnish a basis which will enable the utility to file a proper tariff. Otherwise there would be no end to the controversy. The commission has made the usual findings, but has not prescribed a tariff or found sufficient facts to enable the utility to do so. In many cases we have disposed of appeals before a precise tariff was determined but the circumstances present here require a different procedure.

While a careful consideration of the voluminous record and briefs presented to us, consisting of about nine thousand pages, would seem to indicate that a number of the findings of the commission cannot be sustained on the ground assigned by the commission, it does not follow that the tariff of the respondent should be approved or that the matters taken into consideration by the commission are the only facts that should be considered in finally fixing a rate to be charged by this utility. A determination of a fair value of the property of a utility used and useful in performing its duties to its customers, the rate of fair return on such valuation, and the amount of allowable gross and net rev-

enues are generally recognized as essentials in ascertaining what are fair and reasonable rates, yet such preliminary findings are only a means to an end. Cases have arisen and will frequently arise where other matters are entitled to be considered and are to be thrown into the scale before a reviewing court can say that the utility has been deprived of property without compensation, or more concretely, that a rate is confiscatory. We have such a case here. The other matters to be considered arise by reason of a mass of evidence bearing on comparative rates and on the price which the public will pay for natural gas in competition with other fuels.

The Public Utility Law of 1937, §1005, requires that on hearings before the commission the report or order "shall be in sufficient detail to enable the court on appeal to determine the controverted question presented by the proceeding and whether proper weight was given to the evidence." This is but a recognition of a fundamental principle that where the legislature delegates powers to an extra judicial tribunal appointed to determine property values or rights and the tribunal acts in such matters, it must make such findings that on a review by the court it is possible to determine whether one affected by such determination has been deprived of legal rights.

We are all of the opinion that we cannot perform the duty imposed on us of determining whether the conclusions and findings of the commission are in conformity with law and are supported by the evidence and deal fairly as well with the public as with the appellant until the commission has completed its task by determining what, in its opinion, are fair charges or proper tariffs. There are at least three reasons for so holding.

In the first place, it was shown by convincing evidence that the rates in the posted tariff of respondent

are not only out of line, but far out of line with rates charged by companies throughout western Pennsylvania extending from Tyrone on the east to the Ohio line. Complainants, among other items, furnished evidence tending to show that under the posted schedule of respondent for the year 1932, domestic consumers, including those using gas for heating, paid an average of $2.38 per M. cu. ft. and that if the business had been built up to the saturation point for the same period they would under that tariff have paid at the rate of $1.24 per M. During that same period twelve large natural gas companies in western Pennsylvania with 470,516 domestic consumers, including those using gas for house heating, charged but an average of sixty-two cents per M. In addition, there was a large volume of evidence showing domestic rates charged by most of the principal sellers of natural gas in Pennsylvania and that the charges of all of these other companies were much less than the rates fixed by the proposed tariff of the respondent. As is argued by the appellant, comparative rates should have little bearing on the reasonableness of the price charged here unless the conditions are similar. It seems that the only serious difference between the situation in the Williamsport district and many other points in Pennsylvania is that which arises by reason of the distance from the sources of supply. It should not be difficult to allow for the additional cost of transportation by reason of distance. It is a matter of common knowledge that gas is being transported many hundreds of miles from the midcontinent producing area to places as distant as Detroit, Washington, and Pennsylvania. This would indicate that distance is not an insurmountable barrier. The companies with which a comparison is made have been selling natural gas for fifty years and are known to be functioning and prospering.

Comparative rates are certainly not conclusive and

sometimes are only of slight probative value, but here the evidence was not only admissible and proper for consideration together with other facts in the case, but should have much probative weight in view of the large discrepancy and the extent of the field covered by the facts produced. If a comparison were made with one or two companies it might well be argued that those rates, being subject to the approval of the commission, may have been too low and that the price of gas was not determined alone by the law of supply and demand. We cannot, however, believe that other natural gas utilities would continue to function and that so universally if their rates were so far out of line with a reasonable rate as the respondent's contention would indicate. We are not impressed with the argument of the appellant that there are not sufficient facts in the record to warrant a comparison. This evidence should be considered with the other facts in the case. It is particularly fitting that such evidence should be considered in the light of other evidence tending to indicate that this company may have made considerable investments that were improvident.

In the second place, natural gas is in competition with coal and fuel oil and, beyond a certain price, with manufactured gas. A point of diminishing returns arises by reason of increased price in the sale of all commodities. This is peculiarly applicable to natural gas. There is ample evidence in the record to support a conclusion that as the price of natural gas increases there is a trend toward the use of coal or consumers turn to oil for fuel. See *Chambersburg Gas Co. v. P. S. C.*, supra (p. 229), and *Willcox v. Cons. Gas Co.*, supra (p. 51). It would serve no purpose to fix a price higher than the public will pay before resorting to other fuels. If a rate is fixed which will not promote an expansion of the appellant's market, it cannot function as a natural gas company. On the other hand, "it

is equally true that a reduction in rates will not always reduce the net earnings, but, on the contrary, may increase them. The question of how much an increased consumption under a less rate will increase the earnings of complainant, if at all, at a cost not proportioned to the former cost, can be answered only by a practical test": *Willcox v. Cons. Gas Co.*, supra. The public does not guarantee a utility that its investment will be profitable. The evidence on the record as to the price that will be paid for natural gas in competition with other fuels should have the careful consideration of the commission in the fixing of a proper rate.

There is a third reason for requiring the commission to indicate its judgment as to a schedule of rates. The tariffs posted by the appellant present other questions than what average price it should receive for gas sold, and those tariffs are more complex than we usually find in rate cases. Respondent has apparently attempted to meet the difficulties presented here, to some of which we have referred, by charging a different rate dependent upon the use to which the fuel is put by the consumer. The user of natural gas can afford to and will pay a higher price for gas used for hot water heating, cooking, refrigeration and the like, than for gas used for house heating. With that fact apparently in mind the utility proposes to furnish gas for central heating plants at a reduced rate and all the rates charged for domestic consumption are graduated so as to produce the same result. In so doing the company has created a wide differential in the price charged for the same commodity dependent upon the use to which the gas is to be applied. No doubt a part of the difference is represented by a ready to serve charge and part is attributable to the quantities consumed. We have no doubt of the fairness of a reasonable ready to serve charge and of a reasonable reduction in price proportioned to the amount of gas consumed. These provi-

sions are sound and are in accord with practical business experience, but the wide spread in prices presented by the present tariffs raises a serious question as to their fairness and reasonableness and provokes consideration of a question as to whether they are discriminatory. It is a question if the respondent is not attempting to apply to a natural gas venture the practices of a manufactured gas business where there is a fundamental difference in the elements involved. If the respondent cannot supply natural gas at a rate which will accommodate the public and give the company a fair return on its investment, it should not complain if competition is permitted.

The question of a proper tariff is so interwoven with the other questions presented that we are not in a position to do justice either to the public or the utility on the present state of the record. We cannot sustain a number of the essential findings of the commission or finally dispose of the questions raised by this appeal on the present state of the findings and are therefore compelled to remit the record to the commission that it may receive further evidence if the change in the law or the factual circumstances require it, that further findings of facts be made and that a proper schedule of rates be fixed.

The order of the Public Service Commission is reversed and the record is remitted to the Public Utility Commission for further action not inconsistent with this opinion.