Peoples Natural Gas Company, Appellant, *v.*
Pennsylvania Public Utility Commission.

Argued April 29, 1940.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES and HIRT, JJ.

*Edward M. Borger,* with him *William R. Scott, James B. Sayers* and *Charles W. Cooper,* for appellant.

*Samuel Graff Miller,* with him *Frederick P. Glick* and *Harry M. Showalter,* for appellee.

*Joseph A. Langfitt, Jr.,* Special Assistant City Solicitor, with him *Wm. Alvah Stewart,* City Solicitor, for intervenor.

PER CURIAM, June 24, 1940:

The Peoples Natural Gas Company has appealed from a report and order of the Pennsylvania Public Utility Commission, entered against it on February 15, 1940, by a majority of the commissioners. Chairman Driscoll and Commissioner Buchanan joined in a report supporting the order; Commissioner Beamish filed a concurring report; and Commissioners Siggins and Thorne filed a dissenting opinion.

In the majority report it was held that the appellant utility had not met the burden of proving the "lawfulness" of certain new and increased rates proposed in a new tariff—Pa. P. U. C. No. 19—filed by it on March 17, 1939, under Section 308(a) of Art. III of the Public Utility Law of May 28, 1937, P. L. 1053, 66 PS §1148, to become effective May 16, 1939.

In the concluding paragraph of the majority report the proposed rates were declared to be "unjust, unreasonable, discriminatory and in violation of the Public Utility Law." The order appealed from reads:

"1. That the rates and charges set forth in Tariff Pa. P. U. C. No. 19 of respondent, The Peoples Natural Gas Company, shall not be or become effective.

"2. That the existing rates of The Peoples Natural Gas Company shall remain in effect until further order of the Commission.

"3. That the instant proceeding be and is hereby terminated."

The existing rates referred to in the second paragraph are the rates which appellant has been charging, with

the approval of the former Public Service Commission, since 1924.

The events leading up to the making of the order may be thus summarized:

Appellant was created by the merger of two prior constituent gas companies—the former The Peoples Natural Gas Company and the former The Columbia Natural Gas Company. In 1925 the Peoples company acquired control of the Columbia and was operating it upon the effective date of our present Public Utility Law.

On April 20, 1937, shortly after its organization under the Act of March 31, 1937, P. L. 160, 66 PS §§452-464, the Pennsylvania Public Utility Commission entered, upon its own motion, a complaint against one hundred and four natural gas companies doing business in Pennsylvania, alleging on information and belief that the rates of each were unjust and unreasonable. Each company was given a subnumber at Docket No. C-11380. The complaint against the former Peoples company was docketed at No. C-11380, Sub. 20, and the complaint against the former Columbia company at No. C-11380, Sub. 28. Both companies filed answers denying their rates were unjust or unreasonable.

Under date of July 27, 1937, the commission sent a questionnaire to each company requiring the preparation of detailed data including, inter alia, an inventory of its property priced at the cost of construction or acquisition to the company and also upon a reproduction cost, new, basis, as of December 31, 1936. At the initial hearing against the Peoples company on October 1, 1937, voluminous exhibits were submitted in reply to the questionnaire. The first hearing against the Columbia company was on November 16, 1937, and similar data with respect to that company was then presented. Subsequently, on February 14, 1938, the commission instructed each company that "original

cost" as referred to in the previous questionnaires is to be "interpreted to mean the cost of property to the company first devoting it to public use." Other questionnaires and revisions thereof were issued in May and October, 1938, requiring the preparation and submission of accounting information in detail.

As of December 31, 1938, the former The Peoples Natural Gas Company and the former The Columbia Natural Gas Company, were merged and consolidated under the corporate name, The Peoples Natural Gas Company, and on February 14, 1939, the commission entered an order consolidating the proceedings at subnumbers 20 and 28, at Docket No. C-11380, by reason of the merger.

This was the situation when appellant filed its new tariff on March 17th to become effective May 16, 1939. Its right to file a new tariff, notwithstanding the pendency of the proceedings instituted by the commission against its existing rates, cannot be questioned: *Coplay Cement Mfg. Co. v. Pub. Ser. Com.*, 271 Pa. 58, 114 A. 649, reversing the judgment of this court at 76 Pa. Superior Ct. 354.

On March 20, 1939, the commission, upon its own motion, instituted an inquiry and investigation at Complaint Docket No. 12683 "for the purpose of determining the fairness, reasonableness and justness of the rates and charges" set forth in appellant's tariff, Pa. P. U. C. 19. Upon the same date it ordered that "this inquiry and investigation, C-12683, be and hereby is consolidated for hearing and determination with the inquiry and investigation ...... at C. 11380, Sub. No. 20."

On the same date the commission, pursuant to the authority conferred upon it by Section 308(b) of the Public Utility Law, supra, entered an order suspending the operation of the new tariff for a period of six months, i. e., from May 16 to November 16, 1939; assign-

ing the following reason: "The reasonableness of the rates proposed by Tariff Pa. P. U. C. No. 19 is directly related to the evidence already received in connection with the investigation at C. 11380, Sub. No. 20." On November 13, 1939, the commission entered an order further suspending the operation of the new tariff from November 16, 1939, to February 16, 1940, an additional period of three months, as also authorized by the statute.

Hearings were resumed in March, 1939, at which the appellant presented reproduction cost valuations, both new and less accrued depreciation, of the merged property and testimony with respect to gas reserves, annual depreciation, cost of developing operated leaseholds, etc. A number of hearings were held between October 18, 1939, and January 19, 1940, at which evidence on behalf of appellant and the commission was introduced.

At the final hearing on January 19, 1940, it was stated by the sitting commissioner that the testimony in the proceedings at C-12683 would be closed, but that the proceedings at C-11380, Sub. 20, would remain open for further hearings; hence, the significance of the third paragraph of the order.

Incidentally, it appears from the commission's brief that there was also pending a complaint by the Borough of Tyrone against the former Peoples company at Docket No. C-11587, in which it was alleged the rates charged by that company for natural gas service at Tyrone were unfair and unjust to consumers in the lower brackets. It is also there stated that the commission combined at its hearings not only C-11380, Sub. 20, and C-12683, but also C-11587. The record (335a) shows the three complaints were consolidated for hearing and determination and it is clear from the third paragraph of the order that the commission undertook to terminate thereby only its own complaint at C-12683. It may also be noted that the order with which we are now concerned was entered the day before the expiration of the nine months' period of suspension.

The commission invokes and relies upon Section 312 of the statute, 66 PS §1152, whereby it is enacted:

"In any proceeding upon the motion of the commission, involving any proposed or existing rate of any public utility, or in any proceeding upon complaint involving any proposed increase in rates, the burden of proof to show that the rate involved is just and reasonable shall be upon the public utility. The commission shall give to the hearing and decision of any such proceeding preference over all other proceedings, and decide the same as speedily as possible."

Appellant recognized the duty thus placed upon it and, as we gather from the record and briefs, attempted to comply with the requirement by submitting in evidence, inter alia, the following:

An inventory of its property at book prices as of December 31, 1936, December 31, 1937, and December 31, 1938; a detailed determination of the original cost of its property when first devoted to the public service; appraisals and reproduction valuation made by Messrs. Ford, Bacon & Davis as of December 31, 1936, June 30, 1937, June 30, 1938, and December 31, 1938; a study of the original cost of the properties when first devoted to the public service, trended to December 31, 1938, by applying prices as of that date, and trends developed from the company's books and records; a statement of operating revenues and expenses, and the amount available for return at the existing rates for the years 1937 and 1938; a calculation of operating revenues which would have been earned in 1937 and 1938 had the proposed increased rates been in effect, and the amount which would have been available for return under the proposed rates in those years; a detailed estimate of the operating revenues and expenses under the proposed rates for a normal future year and a calculation of the amount available for return under the proposed rates; expert testimony as to the fair rate of return required

in order to sustain appellant's credit; and detailed studies of the accrued depreciation of the property, based upon observation and inspection, and of a proper annual allowance for depreciation.

It is asserted on behalf of appellant that this testimony showed the reproduction cost, less accrued depreciation, of its property as of December 31, 1938, to be $57,695,275; that its original cost was $47,732,478, and that the net income which would have been earned at the proposed rates for the year 1938 would have been $1,088,961, without including in operating expenses any part of the cost incident to the rate case.

The insurmountable difficulty with which we are confronted in attempting to review this case is that, although the commission had before it a mass of evidence and exhibits, occupying 3337 pages of the printed record and bearing upon the fundamental questions involved in a case of this nature—the present fair value of the property for rate-making purposes, the utility's operating revenues and expenses, the amount to be allowed for annual depreciation, and the fixing of a fair rate of return—it has entirely failed to perform the mandatory duties imposed upon it by the statute under which it functions.

By Section 1005 of Article X, 66 PS §1395, it is provided: "After the conclusion of the hearing, the commission shall make and file its findings and order with its opinion, if any. Its findings shall be in sufficient detail to enable the court on appeal, to determine the controverted question presented by the proceeding, and whether proper weight was given to the evidence."

No specific findings were made by the commission upon any of the controverted questions litigated before it. As to the necessity for and purpose of such findings, see *Pennsylvania Power and Light Co. v. P. S. C.*, 128 Pa. Superior Ct. 195, 218, 193 A. 427.

We have been afforded no opportunity to consider

and determine "whether proper weight was given to the evidence" submitted by appellant. The commission apparently gave it but slight weight and contented itself with the statement of its conclusion of law that the evidence did not show the proposed rates are just and reasonable.

The making of detailed findings is not the only duty the commission failed to perform. As above stated, the new tariff was filed, its operation suspended and the hearings conducted, under Section 308 of Article III of the statute, 66 PS §1148.

By paragraph (c) of that section it is expressly provided: "If, after such hearing, the commission finds any such [proposed] rate to be unjust or unreasonable, or in anywise in violation of law, the commission shall determine the just and reasonable rate to be charged or applied by the public utility for the service in question, and shall fix the same by order to be served upon the public utility; and such rate shall thereafter be observed until changed as provided by this act."

This is a case in which there had been filed, under paragraph (b) of the section, a "tariff stating" new rates and the commission upon its own motion "enter[ed] upon a hearing concerning the lawfulness of such rate[s]." After extended hearings, the commission found the proposed rates "to be unjust, unreasonable, discriminatory and in violation of the Public Utility Law." By the express direction of paragraph (c) it then became its clear duty to "determine the just and reasonable rates to be charged." No effort was made by the commission to perform this duty.

When we turn to an examination of the majority opinion of the commission in endeavoring to ascertain the reason for the conclusion therein stated all we find are four alleged deficiencies in appellant's proofs.

In the first place, complaint is made that appellant failed to comply with the demand of the commission that it submit "a computation of both annual and ac-

crued depreciation based upon age and life." As above indicated, appellant's estimates of depreciation were based upon "observation and inspection," and not upon the so-called straight line method of comparing age in years with an assumed life in years. Reference is made in the opinion to Section 503 of the statute, 66 PS §1213, requiring, inter alia, that "Every public utility shall carry on its books or records of account, proper and reasonable sums representing the annual depreciation on its property used or useful in the public service, which sums shall be based upon the average estimated life of each of the several units or classes of depreciable property." The section quoted is contained in Article V, relating to "Accounting and Budgetary Matters" and affects primarily the manner in which a utility's books shall be kept. We have not been referred to any provision of the statute specifying evidence of depreciation on an age-life basis as the only method of proving depreciation. In the course of the opinion it is said: "Such information is absolutely necessary for an accurate determination of accrued and annual depreciation." The reply of appellant through one of its witnesses was that "the company's experience [had been] insufficient to permit him to make a sound estimate of the service life of its various classes of property." There can be no question that the evidence introduced by appellant was competent. See *Chambersburg Gas Co. v. P. S. C.*, 116 Pa. Superior Ct. 196, 202, 176 A. 794; *Cheltenham & Abington Sewerage Co. v. P. S. C.*, 122 Pa. Superior Ct. 252, 270, 186 A. 149, and *Pennsylvania Power and Light Co. v. P. S. C.*, supra. In connection with the comment in the opinion upon the amount set up upon appellant's books as a reserve for depreciation, reference may also be made to the portion of the opinion of this court in *Solar Electric Co. v. P. U. C.*, 137 Pa. Superior Ct. 325, 9 A. 2d 447, under the heading, "Annual Depreciation," at page 365. If the commission was of opinion that the theoretical age-life

method was preferable, there was nothing to prevent it from making, through its bureaus, its own estimate of accrued and annual depreciation. What the commission may see fit to ask for is one thing, but what a utility must produce in order to sustain its burden of proof in a rate case is a different matter.

Another suggested deficiency of proof cited in the majority opinion is the failure of appellant "to furnish full operating expense and revenue data for 1939." It is stated that appellant was repeatedly asked to furnish this data "but no such information has been forthcoming." We do not so understand the record. Appellant's Exhibit No. 32, introduced at the hearing on December 14, 1939, contained a statement of operating revenue for the twelve-month period ended October 31, 1939. The commission was also furnished with a statement of operating revenues through the month of November, 1939, which it introduced as a part of its Exhibit No. 52. As to operating expenses, the commission was furnished with a copy of appellant's financial statement as of August 31, 1939, accompanied by a letter from appellant's treasurer explaining that, by reason of a change in the "classification of accounts" made by the commission and effective January 1, 1939, it was impossible to comply fully with the request of the commission relative to operating expenses for the entire year of 1939. Referring to the effect of the change in the classification of accounts, the treasurer testified with respect to his ability to supply operating expenses for the full year: "It [the change] has had a very decided effect on it. Under normal circumstances we would at this time be able to produce operating expenses for the month of October. We have had a complete revision of our accounting system, requiring a tremendous amount of work, and in my opinion we will be fortunate if we are able to have operating expenses on an actual basis by the end of March."

It is to be noted that appellant set up in Exhibit No. 32 estimated revenues and expenses for what it terms a "normal future year." This estimate was based largely upon the experience of appellant over the five year period from 1934 to 1938. We are not convinced that the statement of the commission upon this subject was justified.

The next alleged deficiency in appellant's proofs, relied upon by the majority, is its failure to introduce evidence demonstrating the reasonableness of the rate paid by it to one of its affiliates, Hope Natural Gas Company of West Virginia, for gas purchased from it at the West Virginia-Pennsylvania State line. Appellant purchases approximately 20% of its gas requirements from the Hope company and takes the position that the rate it is paying, $35\frac{1}{2}$ cts. net per M. c. f., is an interstate rate over which the Pennsylvania Public Utility Commission has no jurisdiction. This rate is contained in a published tariff filed by the Hope Natural Gas Company with the Federal Power Commission under the Federal Natural Gas Act. Moreover, our commission has recognized the jurisdiction of the Federal Power Commission over this rate by filing with that tribunal a complaint against it, which has not yet been determined. Congress passed the Natural Gas Act, June 21, 1938, C. 556, Sec. 1; 52 Stat. 821; Title 15 U. S. C. A. Sec. 717 subsequent to the institution of the initial proceedings at C-11380.

The minority took the position that "the rate paid by respondent to the Hope Natural Gas Company, for gas purchased by it, is, in our opinion, a matter of federal regulation, and cannot by any stretch of the imagination be considered as before this commission in this case."

A fourth criticism of appellant's evidence relates to its estimate of the annual revenue which it will probably receive from the sale of gas by it to the New York

State Natural Gas Corporation, another affiliate of appellant. The uncontroverted evidence is that whereas prior to December 5, 1939, appellant had purchased gas from the New York company, that company's source of supply suddenly gave out and appellant is now selling gas to the New York company and has pending before the commission an application for approval of a lease of one of its pipe lines for that purpose. Since this change in conditions occurred only about one month before the closing of the hearings it is obviously impossible for anyone to prove how much gas will be sold to the New York Company. It is conceded in the majority opinion that it is impossible for appellant to show conclusively what revenue it will receive from this source. Appellant estimated this revenue at approximately $456,000 per annum. As to this item, the position of the majority seems to be that appellant has not met the burden of proof imposed upon it by the statute with respect to a matter which is not susceptible of proof. It is clear that, as rates must be fixed for the future as well as for the present, estimates of the character here involved must necessarily enter into the disposition of any rate case.

A fifth criticism by the majority is directed to the form of the proposed schedule and it is asserted it will effect a discrimination against the consumers of 15,000 cu. ft., or less. This matter would demand serious consideration if the commission had performed its statutory duty of determining the just and reasonable rates to be charged by appellant for its service. In the present state of the record and under the order appealed from, we cannot review the respective contentions upon this feature of the case.

It is difficult to escape the conclusion, indicated in the minority opinion, to the effect that the majority of the commission has attempted to make a final disposition of this case with undue and unnecessary haste. It

is pointed out in that opinion that appellant's brief was filed with the commission on January 31st, and oral arguments had on February 5, 1940; that no brief was presented by the law bureau of the commission, but three days later a draft of the proposed order was submitted by it without the collaboration at that time of the accounting and engineering bureaus. On February 8, 1940, the draft of the proposed order was submitted to the accounting and engineering bureaus for reports at the meeting of the commission fixed for February 13th. The position taken by the minority commissioners is forcefully stated in the following excerpts from their opinion:

"Two separate proceedings are involved, one the rate proceeding instituted by the commission in 1937, and the other an inquiry as to fairness of the new rates instituted by the commission in 1939. . . . . . .

"When we consider that both cases were consolidated for the purposes of hearing and determination; that the testimony was not completed until January 19, 1940; that the brief of the respondent was not filed until January 31, 1940; that no brief was filed by the Law Bureau of the Commission; that the report of the Law Bureau of the Commission was not filed until February 8, 1940; and that reports of the technical Bureaus of Accounting and Engineering of the Commission were not tentatively made until February 13, 1940, it will be apparent that there was very little time for the commission to carefully consider the serious matters of this proceeding prior to or upon February 15, 1940, the date upon which action must be taken by the commission. . . . . . .

"The technical Bureaus of Accounting and Engineering, upon which the commission should and must rely for technical advice, otherwise the commission will not properly function, reported orally to the commission during the morning of Tuesday, February 13, 1940.

"Based upon its limited study of the record, the Bureau of Accounts advised, that predicated upon what it designated as a maximum rate base, the rate increase would be sustained, but that based upon its finding of a minimum rate base, the increased rate would be only slightly reduced. The Bureau of Engineering, based upon a similarly limited study, advised that it believed the proposed increased rates had been sustained. The Law Bureau advised that it believed the rates had not been sustained, but the Bureau of Accounts and the Bureau of Engineering took exception not only to the methods of computation, but also to the principles applied by the Law Bureau in arriving at its conclusion. . . . . . .

"Believing that the commission should have more time to further study the affairs of the company, in order to arrive at a fair value of its property, and fair rate of return thereon, we were opposed to voting in favor of the proposed increase of rates, which action, if taken by the commission, would at once also terminate the rate case instituted in 1937. For the same reason we were opposed to voting against the proposed increase of rates. . . . . . .

"Believing that it is the duty of the commission to first arrive at the fair value of the respondent's property, and then to fix a fair rate of return thereon, it is our opinion that the commission, in the absence of both a fair value and a fair rate of return, should have taken no action whatsoever on the proposed increase of rates, but permitted them to go into effect by operation of law. . . . . . .

"Such action would have made possible the issuance of an order providing for reparation, should either the existing or proposed rates have been found unreasonable after a careful analysis and consideration of the record before us."

While we do not agree with the earlier statement of

the minority that it was necessary for the commission to take some action before the expiration of the suspension period, we are in accord generally with the views expressed in their opinion. It seems to us there was testimony before the commission from which it could, with the assistance of its various bureaus, have made specific findings upon many of the prime factors involved in every rate case. If the commission deemed the evidence insufficient in some respects, there was nothing to prevent it from proceeding with hearings until all available evidence had been placed upon the record either by appellant or through the commission's accounting and engineering bureaus.

Nor are we convinced the commission was justified in undertaking to separate the proceedings at No. C-11380 from those at No. C-12683, and attempting to decide finally only the latter case, permitting the former to remain open. These complaints were properly consolidated "for hearing and determination," with the effect that the original complaint against appellant's existing rates was completely merged with the subsequent complaint against the proposed increase in rates. The fundamental issue in each case was and still is the same; namely, the revenue which appellant is lawfully entitled to receive and what rates will yield that revenue. The same evidence with respect to rate base, operating expenses, annual depreciation, rate of return, and the like, is relevant and essential no matter which schedule is being considered.

The situation here is comparable to that which existed in *Coplay Cement Mfg. Co. v. Pub. Ser. Com.*, supra, where the utility filed a tariff increasing its rates although a complaint against a prior increase was pending before and undetermined by the commission. In the course of its opinion the Supreme Court said: "It must be remembered the real issue before the commission is a complaint as to rates, and though a change in the

rate has been filed, the commission may,—and it has the power under the act,—consolidate these several schedules of rate increase, and cause the complaint, the record and the evidence, to be taken as a complaint, record and evidence in connection with the new rate."

So far as the record indicates, each side closed its evidence generally and without making any distinction between the two complaints. There is no suggestion that the commission has any further or different evidence to introduce with respect to the existing rates. A determination, in the manner provided by the statute, of the reasonableness of the proposed rates will also dispose of the complaint against the existing rates. If the increased rates should finally be justified, the existing rates will necessarily also be justified. If the commission should ultimately find that the proposed rates will produce an excessive amount of revenue it will then be its duty, as above indicated, to determine the just and reasonable rates to be charged and specifically fix the same by its order.

In *Pennsylvania Power and Light Co. v. P. S. C.*, supra, where the commission merely sustained complaints against new increased rates without determining what would in fact be the reasonable rates, we said: "The primary question for the commission in this case is whether the rates prescribed by the respondent's tariffs are fair and reasonable. If, in answering this question, it is found that the rates are too high, the commission must then necessarily either indicate a proper charge or furnish a basis which will enable the utility to file a proper tariff. *Otherwise there would be no end to the controversy.*"

A review of the record indicates that appellant introduced its testimony at the hearings in October, November and December of 1939, and upon January 10, 1940, and then rested its case in chief. Counsel for the commission introduced evidence in behalf of the com-

mission upon January 10th, 11th, 12th and 19th and then stated, "Commission rests." There was no intimation that he intended to rest only at C-12683. All of the testimony introduced on both sides applied to both complaints as consolidated.

The first indication that the commission proposed to hold open the original complaint was given by the sitting commissioner when he said, "I don't believe that there is any particular rush in closing that case, such as creeps into the commission complaint at Docket No. 12683 where a time limit is set by the act."

This statement seems to us to be based upon a misconception of the provisions of the statute. The only time limit prescribed by paragraph (b) of Section 308 relates to the maximum period of suspension. It is there provided that whenever there is filed with the commission by any public utility "any tariff stating a new rate" the commission may, upon its own motion or upon complaint of a consumer, "enter upon a hearing concerning the lawfulness of such rate, and pending such hearing and the decision thereon," may, at any time prior to the effective date of the tariff, "suspend the operation of such rate for a period" not exceeding nine months, during which the existing rate "shall continue in force during the period of suspension, unless the commission shall establish a temporary rate as authorized in section three hundred ten of this act." No temporary rates were prescribed in this case. The only provision having any relation to the time within which complaints against rates shall be decided is found in the last paragraph of Section 312, heretofore quoted. That section applies, inter alia, to complaints by the commission against existing, as well as proposed, rates. The last paragraph reads: "The commission shall give to the hearing and decision of any such proceeding preference over all other proceedings, and decide the same as speedily as possible." This direction falls

far short of supporting the commission's construction. On the contrary, it places the complaint at C-11380 upon a parity with C-12683 as respects speed of disposition.

As the commission has based its order upon the conclusion of the majority that appellant did not sustain the burden of proof imposed upon it, and as this case must be remanded to the commission for the completion of its statutory duties, it may be proper to make some reference to the nature and extent of that burden. It is clear that whenever the commission institutes, under the present statute, any proceeding involving any proposed or *existing* rate the burden of proof to show that the rate involved is just and reasonable is upon the utility: *Solar Electric Company v. P. U. C.*, supra, at page 332. We have had occasion to refer several times to the extent of this burden. In *St. Clair Coal Co. Inc. v. P. S. C.*, 79 Pa. Superior Ct. 528, we said: "It [the utility] initiated the rates; it must sustain them. By the *fair weight of the evidence* it must show that the filed rates under attack are of a kind not forbidden by the statute, and that the total revenue which the utility expects to receive under the schedules and classifications which make up the tariff will equal and not exceed that to which it is entitled. The burden is no greater than this." (Italics supplied).

Again, in *Wayne P. S. Association v. P. S. C.*, 94 Pa. Superior Ct. 228, we said: "In general terms the burden [the utility] is required to meet is that the evidence offered be sufficient in quantity and quality to satisfy a reasonable mind that the facts are as alleged."

Many additional important and controverted matters have been discussed at length in the able and elaborate briefs upon both sides, but, for the reasons above stated, we cannot consider them in the absence of specific findings thereon by the commission.

Our conclusion is that this appeal must be sustained and the order appealed from vacated in its entirety by

24

reason of the errors of law and procedure which we have herein considered.

The order of February 15, 1940, is wholly vacated and the matter is remanded to the commission for further proceedings, not inconsistent with this opinion, upon the complaints as consolidated under the prior orders of the commission. The costs resulting from this appeal, including the printing of the record, to be equally divided between the commission and appellant.