RAFAEL MEANA et al., Plaintiffs-Appellees, v. DONALD R. MORRISON, Director of Personnel, METROPOLITAN SANITARY DISTRICT OF GREATER CHICAGO, et al., Defendants-Appellants.

(No. 60627;

First District (2nd Division)—May 6, 1975.

Allen S. Lavin, James B. Murray, and Ina S. Winston, all of Chicago, for appellants.

Richard F. McPartlin, of Chicago, for appellees.

Mr. JUSTICE STAMOS delivered the opinion of the court:

Plaintiffs, three examinees and candidates for the position of Electrical Instrument Mechanic in the Metropolitan Sanitary District of Greater Chicago (hereinafter "District"), brought this action for declaratory judgment, seeking a determination that the action of Donald R. Morrison, director of personnel of the District (hereinafter "Director"), in cancelling the eligible register for said position, was void and illegal. The trial court found that the action of the Director, in purporting to

850

void the examination and resultant eligible list, was arbitrary, capricious and unreasonable, and ordered defendants to reestablish the eligible list as of its original date of posting. From that judgment, defendants appeal and contend that the trial court erred in ordering the reinstatement of the eligible list. In support of the judgment below, plaintiffs assert that the Director had no authority to cancel the eligible list; alternatively, that the rule relied upon by the Director in cancelling the eligible list is void and unconstitutional; and that, in any event, the examination was competitive and the Director was guilty of an abuse of discretion in cancelling the eligible register. The facts follow.

On September 11, 1973, the District posted an announcement that a civil service examination for the position of Electrical Instrument Mechanic would be given on October 27, 1973.[1] The announcement explained that the duties of an Electrical Instrument Mechanic are to repair, calibrate, and maintain various types of instruments used by the District in the process of treating sewage and industrial wastes, and further specified that the examination would consist of a written test weighted 70% and an education and experience evaluation weighted 30%. Candidates were informed by the announcement that the examination would test their knowledge in the areas of electricity, meter and flow theory, their mathematical and verbal skills, and their ability to use various types of tools.

By letter dated October 19, 1973, the District directed 28 of the candidates to report for the examination to Room 1303 at DePaul University, and directed 25 of the candidates to report to Room 1301 at the same location on October 27, 1973. The last sentence of each letter stated that "[n]o books or other aids will be permitted."

Plaintiffs Rafael Meana and James Tamburrino and defendants' witnesses, Richard Ackol and Maddix Moore, reported to Room 1303. Plaintiff John Groeneveld reported to Room 1301. They did not bring electronic calculators or slide rules to the examination.

After all the candidates in Room 1303 were seated and just prior to the time that they commenced the examination, a candidate, James Lippert, asked the proctors for permission to use an electronic pocket calculator. The proctors did not know whether calculators were permitted, therefore one of them departed the room and inquired of the District's special examiner, Dale Smith. Mr. Smith entered Room 1303 and announced that calculators and slide rules could be used because

---

[1] At the time of trial, there were seven vacancies for the position of Electrical Instrument Mechanic and it was anticipated that another four vacancies would arise during the life of the list which resulted from the test given October 27, 1973.

the test was designed so that these devices would not make any difference and in fact, they might be detrimental. Mr. Smith was not authorized by the Director to grant permission to use outside aids.

James Lippert, who ranked sixth on the eligible list, testified that after the special examiner had authorized the use of calculators, his fellow examinees objected and there were "boos and hisses" in the room. He stated that the numbers and arithmetic were fairly simple, but that he utilized the calculator for approximately 25 questions. He was positive in his belief that he could have scored just as well without a calculator.

John Markovich, who ranked 13th on the eligible list, stated that as he entered Room 1303, he inquired of the proctors if he could use a slide rule and when they said no, he placed his slide rule in his coat. He testified that when the announcement was then made that outside aids could be used, the class manifested its dismay and chagrin by loud and uproarious objections. Permission was then given, so he retrieved his slide rule from his coat and returned to his seat. Although he relied upon the slide rule for one to three questions, he felt reassured with the knowledge that it was available to him.

Maddix Moore, who ranked 17th on the list, testified that he saw James Lippert and another candidate with calculators, and also observed others possessed of slide rules. He believed it to be unfair that the special examiner had authorized the use of outside aids despite the prohibition in the letter, and he joined with the rest of the class and objected vigorously when permission was granted. He stated that the announcement "shook me up really bad" because he realized that to be permanently appointed as an Electrical Instrument Mechanic, he not only had to score at the top of the list but he had to do so while competing against people who could use calculators on the examination. He further stated that he completed the test about 5 minutes before the time was up and that consequently he was unable to check his answers; if he had used a calculator, he would have finished the test earlier and thus would have been able to review his paper.

Richard Sackol, who ranked 12th on the eligible list, testified that when the special examiner stated that calculators would provide no advantage on the examination, the majority of the class, himself included, protested and expressed their dissatisfaction. He observed two persons in possession of calculators and became more disturbed as he labored on the test, realizing that almost one-half of the examination consisted of math problems. While he was taking the examination, he felt at a disadvantage because he believed that anyone who had an aid would perform with greater speed and accuracy.

Plaintiffs, Rafael Meana, who ranked fifth on the list, and James Tamburrino, who ranked second, both protested the announcement that calculators would be used on the examination. Mr. Meana felt disturbed and joined in the "loud negative protest" voiced by the room. Both testified that the arithmetical computations involved division, long division, addition, subtraction, and multiplication. Generally, the numbers involved in the computations were whole numbers or two- to three-digit decimals. Both witnesses stated that a calculator would not have assisted them in the examination.

Plaintiff John Groeneveld, who placed ninth on the list, took the examination in Room 1301. In that room, no question arose concerning the use of outside aids, nor was there evidence that outside aids of any type were used. Consequently, there was no disturbance in Room 1301.

The examination consisted of 135 questions, for each of which four multiple choice answers were supplied. Louis Margolin, a college instructor in electrical engineering who prepared the examination, testified that 60 questions involved mathematical computations. According to Margolin, the amount of arithmetic which a candidate would have employed in solving a problem would have varied considerably depending upon the method which the individual relied upon to arrive at an answer. The candidates would also have used arithmetical computations to prove a problem. He himself, however, did not find the calculator as an advantage or disadvantage in either making up or solving the problems.

Shortly after the eligible list for the position of Electrical Instrument Mechanic was posted on January 21, 1974, Maddix Moore called his union representative to complain that some of the candidates had the benefit of being able to use outside aids during the test. On or about January 30, 1974, the union's business representative telephoned defendant Donald R. Morrison, and asked him whether calculators had been allowed during the examination and if so, whether that was contrary to the instructions contained in the District's letter of October 19, 1973. The Director replied that the letter sent to the candidates prohibited calculators. He further stated that he did not know if such devices had been permitted but that he would make an immediate investigation. The investigation disclosed that the special examiner had indeed given the candidates in Room 1303 permission to use calculators.

The day after the Director received the call from the union representative, Maddix Moore telephoned the Director and told him that calculators had been used in his room, that he had objected at the time, and that he felt it was unfair because the letter sent to all candidates had stated that no calculators or other aids would be permitted at the ex-

amination. A few days later, Maddix Moore and Richard Sackol delivered letters to the Director wherein they expressed their belief that the use of aids deprived them of a fair chance to compete.

By letter dated February 6, 1974, the Director informed Bart T. Lynam, the District's general superintendent, that:

> "It has come to my attention that uniform testing conditions were not utilized for the written test held October 27, 1973 for the Electrical Instrument class. Consequently, under the provisions of Personnel Rule 6.661, I declare that written test to be void."

The letter further stated that an equivalent form of the written test would be administered to those candidates who had participated in the October 27, 1973, test and that a new eligible list would be established at the earliest possible date. On the same day, the eligible list, which previously had been posted, was removed.

On February 7, 1974, the Director had a conversation with Mr. Meana and Mr. Groeneveld. He indicated that he did not believe that the mathematics were of such difficulty which would necessarily require the use of some kind of aid, but that this was moot so far as he was concerned, because of the psychological effect on the candidates in the room. What mattered was that the persons who did not possess calculators thought calculators would have helped them, and were distressed and unable to proceed in the examination with the same degree of certitude that they would have if the conditions had been serene. Also, those candidates who used calculators felt that the devices were helping them. This is what he meant when he suggested in his letter to the general superintendent that uniform standards were not present.

On February 8, 1974, letters were sent by the Director to all of the persons who had taken the test, informing them that the written portion of the examination had been voided, and that a new test would be administered on March 16, 1974.

On March 7, 1974, plaintiffs filed for a temporary restraining order to prevent defendants from holding the new examination. On March 11, 1974, the circuit court ordered, upon agreement of the parties, that the examination be held as scheduled and plaintiffs be given leave to take the test without prejudice to their rights. The court further directed that the examination papers from March 16, 1974, be impounded without being graded until further order of the court.

The cause was tried on April 24, 1974. At the conclusion of the trial, the circuit court found that a calculator was an aid within the meaning of the admonition contained in the letter but ruled that the action taken by the Director in voiding the examination was arbitrary, capricious and unreasonable. The court ordered that the eligible list be reestab-

lished as of its original date of posting without prejudice to the right of the Director to strike from the list the names of those who used calculators during the examination.

We turn first to plaintiff's contention that the Director lacked authority to cancel the eligible list under the circumstances presented. In support of their position, plaintiffs refer us to the statutory provisions governing the Director's conduct in the preparation and cancellation of the eligible register. The authority to create the register of eligibles is found in section 4.9 of the sanitary district act of 1889 (Ill. Rev. Stat. 1973, ch. 42, par. 323.9), while the authority to cancel is contained in section 4.7 of the act (Ill. Rev. Stat. 1973, ch. 42, par. 323.7), which, *inter alia,* provides:

> "The Director may, in his discretion cancel such portion of any such register as has been in force for more than 1 year, but not while any vacancy exists for the filling of which a requisition has been made, and which can be filled from said register."

As applied to the instant case, plaintiffs assert that no other pertinent statutory provision explicitly authorizes the Director to cancel an eligible register. Since section 4.7 authorizes the cancellation of the register only after it has been in effect for 1 year, and since the Director in the present case cancelled the register approximately 2 weeks after *its* creation, plaintiffs conclude that the Director's action was unauthorized. We disagree.

The fact that there is no explicit language authorizing the cancellation of the eligible register before the expiration of one year is of no consequence. The applicable rule of construction is that an express grant of power includes the authority to do all that is reasonably necessary to execute the power or perform the duty specifically conferred. (*Owens v. Green,* 400 Ill. 380, 81 N.E.2d 149; *A. E. Staley Manufacturing Co. v. Environmental Protection Agency,* 8 Ill.App.3d 1018, 290 N.E.2d 892.) Under the terms of section 4.7, the Director "shall control all examinations" and may designate persons to be special examiners. It is the duty of the special examiners to conduct the examinations as the Director may direct. The statute further mandates that the examinations be public, competitive, practical in nature, and relate to those matters which fairly test the relative capacity of the persons examined to discharge the duties of the position to which they seek appointment. (Ill. Rev. Stat. 1973, ch. 42, par. 323.7.) Pursuant to this grant of power, we think it clear that when the statutory mandates are not adhered to, the Director has the authority to void an examination and cancel the resultant list of eligibles.

■■ In *People ex rel. Heineck v. Holding,* 207 Ill.App. 38, the court held that the Cook County Civil Service Commission had the power to set

aside an examination which, in the commissioners' opinion, had been irregularly, unfairly or improperly conducted. In response to the contention that the commissioners had no power to set aside the examination, the court, in language appropriate to this appeal, stated:

"The power of the commissioners must, of course, be determined by the terms of the statute, and we find that while commissioners are authorized to appoint examiners, the statute expressly directs that the commissioners shall control all the examinations, and later provides that they shall investigate the action of the examiners. The purpose of these provisions is clear. The provisions of the statute were intended to create conditions under which appointment to positions in the county service should be on the basis of merit. To this end a commission is created, charged with the duty of faithfully carrying out the provisions of the statute, and in this work it is empowered to secure the assistance of examiners, but in that connection the statute makes it very plain that it shall retain the duty of controlling the examinations and investigating the action of the examiners whom they appoint. To say that it has these powers and duties and no power to set aside an examination, which in its opinion had been irregularly or improperly conducted, would be a distinct contradiction in terms. * * * We are of the opinion that it necessarily follows that when an investigation of the action of the examiners discloses facts which, in the opinion of the commissioners, convince them that an examination has been unfairly or improperly conducted, it is not only within their power, but it is their duty, under the statute, to set that examination aside." (207 Ill.App. 38, 41-42.)

Similarly, the power conferred upon the Director under the present statute authorizes the cancellation of an improperly or unfairly conducted examination. Given this authority, it would be a *non sequitur* of the salutary purposes of the section to say that the Director could void the examination and yet not cancel the resultant register of eligibles. For the register exists only by virtue of the examination results; when those results are properly voided it must follow that the authority exists to void the register as well. See *People ex rel. Erickson v. Sheehan*, 24 Ill.App.2d 43, 163 N.E.2d 834; *McCully v. Brennan* (1953), 121 N.Y.S.2d 549.

It is next asserted by plaintiffs that the rule which was relied upon by the Director in voiding the examination is invalid and unconstitutional. Rule 6.661 of the Rules of the Department of Personnel provides:

"*Voiding of test or examination:* If at any time the Director of Personnel is of the opinion that the established examination standards

have not been adhered to, he may declare such test or examination void."

Plaintiffs argue that Rule 6.661 constitutes an overbroad delegation of power to the Director without setting forth standards, and therefore, is unconstitutionally vague. Complaint is made that the phrase—"established examination standards"—has no precise meaning or frame of reference and that the use of the word "may" invites arbitrary and capricious action.

To reiterate, under the terms of section 4.7, the Director is authorized to void examinations which, through irregular or improper conduct, violate the statutory mandate that such examinations be competitive. The rule, therefore, merely specifies that authority which the statute has given and it is, in part, the standard of competitiveness to which the rule refers. Neither the statute nor the rule is unconstitutional merely because its application requires the Director to exercise a value judgment in applying an objective standard. In rejecting a contention similar to that of plaintiffs', the court in *Hill v. Relyea*, 34 Ill.2d 552, 555-556, 216 N.E.2d 795, stated:

> "Absolute criteria whereby every detail necessary in the enforcement of a law is anticipated need not be established by the General Assembly. The constitution merely requires that intelligible standards be set to guide the agency charged with enforcement, [citations] and the precision of the permissible standard must necessarily vary acording to the nature of the ultimate objective and the problems involved. [Citations.]
>
> In this case the legislature gave the superintendent of the hospital the power and authority to discharge patients 'as the welfare of such person and the community may require.' The legislature has determined who shall discharge patients and the criteria for discharge but it has granted authority to the Department of Mental Health and to the hospital superintendent to use discretion in executing the law and in granting the discharge. This discretion must be exercised within the standard set forth by the General Assembly. The difficulty in attempting to establish more precise legislative standards is readily apparent."

Rule 6.661 does not go beyond what the legislature has authorized in section 4.7 (Ill. Rev. Stat. 1973, ch. 42, par. 323.7), and is reasonable in light of the stated objective of the statutory scheme. (See *Reis v. Hoberman* (1909), 65 Misc.2d 966, 319 N.Y.S.2d 453; *People ex rel. Erickson v. Sheehan; People ex rel. Heineck v. Holding.*) Accordingly, we find the rule to be valid.

Finally, it is contended by defendants that the trial court erred in

ordering the reinstatement of the eligible register. The basis of the trial court's decision was that the Director's action in voiding the examination was arbitrary, capricious and unreasonable. In support of the trial court's decision, plaintiffs argue that the examination was competitive and the Director was guilty of an abuse of discretion in cancelling the eligible register.

■■ A competitive examination is one in which the candidates are required to participate against each other equally before the examiners in answering questions of like character and nature and to have equal opportunity to compete each against the other under like and similar conditions. (*Civil Service Com. v. Frazzini* (1955), 132 Col. 21, 287 P.2d 433.) Under this standard of competitiveness, we cannot say that the Director's action was arbitrary or unreasonable. The obvious purpose of the letter to the candidates, informing them that "no books or other aids will be permitted" during the examination, was to maintain the integrity and competitiveness of the testing procedure. The special examiner's unauthorized act of granting permission to use outside aids undermined the integrity of the instructions contained in the letter and made suspect the competitiveness of the examination. Because of the special examiner's permission, a situation was created in which some of the candidates were able to use outside aids while others were not—clearly a situation violative of the statute and of the letter sent to the candidates.

■■ Plaintiffs, in support of their argument that the examination was competitive, point to evidence that the arithmetical computations were simple and no advantage would be gained by the use of mechanical calculators. This conclusion, however, fails to take into account the intangible elements of individual performance, and more importantly, fails to consider the psychological disadvantage suffered by those who labored without the benefit of mechanical aids. Several witnesses testified that the use of calculators would have provided an advantage in terms of speed and accuracy. Furthermore, the uncontradicted testimony of the witnesses who were in Room 1303 was that when the special examiner authorized the use of calculators and slide rules, the candidates who did not have these aids were disturbed and objected strongly. The trial court, at one point, noted: "The fact that there was an uproar in the class is plain on the record." Several of the witnesses testified that the knowledge that they would have to place high in the examination in order to obtain one of the positions, coupled with the knowledge that their competitors would be using calculators, was an emotionally upsetting experience. We are mindful that no exact criteria exist for gauging the effect of the stressful conditions on individual performance, or for measuring the degree of speed and accuracy which a calculator would

provide in answering the examination problems. However, conclusive proof of noncompetiveness is not necessary to support the Director's action. The question presented is whether the Director's action was arbitrary and unreasonable in contemplation of law. The record reveals that the examination was improperly administered, and the evidence fairly supports the Director's conclusion that the competitiveness of the examination was possibly impaired. (See *Katz v. Hoberman* (1971), 28 N.Y.2d 530, 319 N.Y.S.2d 73, 267 N.E.2d 886.) Therefore, the basis of the Director's action was a rational one, and did not warrant the finding that his conduct was unreasonable and arbitrary.

For the reasons stated, the judgment of the circuit court is reversed and remanded for further proceedings not inconsistent with the views herein expressed.

Reversed and remanded.

DOWNING, P. J., and LEIGHTON, J., concur.