563 P.2d 588

**MOUNTAIN STATES TELEPHONE AND TELEGRAPH COMPANY, Petitioner-Appellant and Cross-Appellee,**

v.

**NEW MEXICO STATE CORPORATION COMMISSION, Columbus Ferguson, Chairman, Floyd Cross, Member, Charles Rudolph, Member, Respondents-Appellees and Cross-Appellees,**

**and**

**New Mexico Retail Association, Intervenor-Appellee and Cross-Appellant.**

**No. 10983.**

Supreme Court of New Mexico.

April 20, 1977.

Rehearing Denied May 11, 1977.

Campbell & Bingaman, Santa Fe, Pauline J. Nelson, Albuquerque, for petitioner-appellant and cross-appellee.

Toney Anaya, Atty. Gen., William C. Primm, Asst. Atty. Gen., Santa Fe, for Corporation Commission.

Montgomery, Federici, Andrews & Hannahs, Frank Andrews, III, Santa Fe, for intervenor-appellee and cross-appellant.

## OPINION

EASLEY, Justice.

This cause was removed from the New Mexico State Corporation Commission (Commission) after a rate increase applied for by Mountain States Telephone & Telegraph Company (Mountain Bell or the Company) had been denied by the Commission. We reverse the Commission and remand with instructions.

In April, 1975, Mountain Bell filed an application with the Commission for a determination of its revenue requirements and for permission to file a schedule of proposed rates to obtain additional revenue. The parties stipulated that the hearings would be conducted in two phases, the first to be concerned with the adequacy of Mountain Bell's rate of return, the second to be for the determination of a schedule of rates.

On July 9, 1975, the Commission entered its order that Mountain Bell was entitled to an 11.7% rate of return on its average book equity, which translated into a finding that Mountain Bell was entitled to earn an additional $12,900,000 in revenue annually.

On July 14, 1975, Mountain Bell filed proposed rates designed to raise this additional revenue. The New Mexico Retail Association (Association) intervened to oppose the rates. By order dated January 12, 1976, the Commission refused to approve the proposed rates on the basis that Mountain Bell had not sustained its constitutional burden of proof that the rates were fair and reasonable. Mountain Bell was advised by order of the Commission that a new application would be required, along with the requisite notice and a second full hearing.

On February 3, 1976, Mountain Bell petitioned the Commission for an even-percentage increase in rates for all services to provide the required revenue, or, in the alternative, for the Commission to fix reasonable rates. On February 11, 1976, the Commission denied this petition for a supplemental order. The cause was then removed by Mountain Bell to this court. The Association is before this court on cross removal.[1] On July 13, 1976, this court ordered the rates proposed to and rejected by the Commission to be fixed under bond.

The issues raised by Mountain Bell are: (1) whether, once the Commission had determined that Mountain Bell was entitled to an 11.7% rate of return it had a constitutional duty to fix the rates to provide the revenue; (2) whether, under the New Mexico Constitution, the Commission had only six months within which to fix some schedule of rates rather than just to deny the proposed rate schedule; (3) whether the Commission's denial of a motion to allow its new rates to go into effect under bond during the six months' period constituted confiscation of Mountain Bell's property in violation of the United States and New Mexico Constitutions; (4) whether the Commission erred in holding that Mountain Bell had failed to meet its burden of proof; and (5) finally, whether the Commission should be directed on remand to consider the most recent data in establishing the rate base period for an 11.7% return and should be directed to fix a permanent schedule of rates from January 14, 1976.

The Commission and the Association contested each of the utility's contentions.

This court's scope of review is set forth in N.M.Const. art. 11, § 7 where it is provided that:

---

1. See N.M.Const. art. 11, §§ 7, 8.

. . . the said Court shall have the power and it shall be its duty to decide such cases on their merits, . . .

This section was last considered in *State Corporation Com'n v. Mountain States Tel. & Tel. Co.,* 58 N.M. 260, 270 P.2d 685 (1954) (hereinafter Mountain States 1954) where the court relied upon *Seward v. D. & R. G.,* 17 N.M. 557, 131 P. 980 (1913) in which the court stated (17 N.M. at 583, 584, 131 P. at 989):

> Our constitution . . . requires this court to pass upon the merits of the case, without indulging in any presumptions. This being true, it is our duty to take the order made by the commission and test its reasonableness and lawfulness by the evidence adduced upon the hearing. This court forms its own independent judgment, as to each requirement of the order, upon the evidence, . . .

■ This court, however, in *Mountain States 1954,* supra, held that we are not a rate-making body, that we do not have the power or authority to determine what a fair actual rate is and that we can only determine whether an order of the Commission is just and reasonable and to be enforced, or the contrary.

1. Mountain Bell argues that after the Commission found that Mountain Bell was suffering a revenue deficiency and determined a rate of return to which it was entitled, the Commission had a duty under the constitution and under its own rules to fix the schedule of rates sought to be implemented by Mountain Bell or to substitute a schedule of rates that the Commission found to be fair.

Mountain Bell has a legitimate concern that unless this court rules that the Commission has a positive duty to fix rates when it has disapproved those filed by the utility, the Commission could intermittently turn down proposed rates each six months, causing severe and irreparable injury to Mountain Bell from the loss of revenue. It is contended that the Commission could continue to deny entire rate structures unless Mountain Bell proved with mathematical precision to the satisfaction of the Commis-

sion the reasonableness of each of its four thousand separate rates for services and equipment.

On the other hand, the Commission and intervenors understandably contend that if this court holds that the Commission has a positive duty to fix rates, the utility could file a schedule of rates unsupported by sufficient data to substantiate the reasonableness thereof and thus place the burden back on the Commission to assemble the evidence necessary to support the reasonableness of the rates.

There is validity to the apprehensions of both sides. The problem becomes one of arriving at a solution that will prevent the occurrence of either of the postulated radical extremes.

■ In defining the duties of the Commission with regard to establishing telephone rates, the framers of the Constitution would have had difficulty finding language that was more clear, concise and forceful. N.M.Const. art. 11, § 7 states in part:

> The commission *shall have power and be charged with the duty* of *fixing, determining, supervising, regulating* and *controlling* all charges and rates of . . . telephone . . . companies . . . within the state . . .. The commission shall have power to change or alter such rates, to change, alter or amend its orders, rules, regulations or determinations, and to enforce the same in the manner prescribed herein; . . . and it shall have power, upon a hearing, to determine and decide any question given to it herein, . . . (Emphasis added.)

The words "shall . . . be charged with the duty" indicate that the provision is mandatory rather than discretionary. See § 1–2–2(I), N.M.S.A.1953 (Repl. Vol. 1, 1970); *State v. Lujan,* 90 N.M. 103, 560 P.2d 167 (1977); *Application of Sedillo,* 66 N.M. 267, 347 P.2d 162 (1959).

According to Webster's Third International Dictionary (1971), to "fix" is "to give a final or permanent form to": make definite and settled: to "determine" is "to fix conclusively or authoritatively . . . to

settle a question or controversy . . . to settle or decide by choice of alternatives;" "control" is the "power or authority to guide or manage: directing or restraining domination."

The statutes serve to implement the broad grant of constitutional authority to the Commission, giving it the power to prescribe its own rules, inspect a company's records, require reports under oath, initiate petitions for grievances and mediate them, grant time for assembling evidence, adjourn or continue hearings, investigate and take testimony, compel production of documents, invoke the aid of the courts, and take depositions. Sections 69–7–1 through 69–7–10, N.M.S.A.1953.

The Corporation Commission's rules further define the duties and authority of the Commission. Mountain Bell contends that it is entitled to rely on the duty imposed by § 8 of the Corporation Commission Rules, Docket No. 346 (1952) to establish that the Commission has a positive duty to fix rates:

If, after any such hearing, the *Commission finds* any such rate or *rates* to be unlawful or *unreasonable,* or both, or any part thereof, and the Commission *having determined* the *reasonable* or lawful rate or *rates* to be charged by such person subject to these rules herein, and *shall fix the same* by Order, *or order* such company to fix such reasonable and lawful rates *in accord* with the *findings* of the Commission . . .. (Emphasis added.)

Mountain Bell claims the Commission established a precedent upon which it could rely as to the Commission's interpretation of its authority and responsibility as set forth in the Mountain States' order of 1973 in which the Commission did not limit itself to considering only rates for which Mountain Bell had requested changes. The Commission explained its action as follows:

. . . we direct increases in certain rates not requested by the applicant. Since the applicant has presented an "open filing" to the commission, it is our view that *we have authority to adjust and change any rate,* even though not requested to do so by the applicant, if such adjustment and change is fairly indicated by all circumstances. (Emphasis added.)

*Mountain States Teleph. & Teleg. Co.,* 2 P.U.R. 4th 332, 359 (N.M. State Corp. Com'n 1973).

■ It is difficult to conceive of a more clear and all-inclusive grant of power to a governmental agency. The Commission has a duty to be a prime mover in the procedure to see that the public interest is protected by establishing reasonable rates and that the utility is fairly treated so as to avoid confiscation of its property. Considering this broad mandate it could hardly be envisioned that the Commissioners would sit as spectators, like Roman Emperors in the coliseum, and simply exhibit a "thumbs-up or thumbs-down" judgment after the dust of battle settles in the arena.

That this Commission may misapprehend its constitutional duties is demonstrated by the fact that it did not call a single witness and did not introduce a single exhibit in relation to the issues before us. Only one witness was called by the Commission in the first phase of the hearings and only five pages of exhibits were introduced. However, there was rigorous cross-examination of Mountain Bell's and the Association's witnesses by the Commission, and material evidence by way of testimony and exhibits was introduced by the Association with support from the Commission. Historically, the Commission has had insufficient funds to perform fully in this area, although the State has a solemn obligation to provide adequate monetary support so that it may fulfill its constitutional duty. The magnitude of the problem calls for serious consideration by New Mexico lawmakers.

There are no New Mexico cases that precisely address the question as to the circumstances under which it is mandatory that the Commission act to fix rates when proposed rates have been rejected. Although the fact situation in the case is not fully analogous to ours, the reasoning of Justice Cardozo in the United States Supreme Court case of *Dayton P. & L. Co. v.*

*Comm'n,* 292 U.S. 290, 54 S.Ct. 647, 78 L.Ed. 1267 (1934) is persuasive. The Commission in that case had rejected the utility's rates in their entirety because it disagreed in part with the Company's schedule. Justice Cardozo said (292 U.S. at 294, 54 S.Ct. at 650):

At the threshold there is a controversy as to the scope of the problem before us for solution. The appellee [*Commission*] argues that the only question for the *Commission was one as to the reasonableness of the new schedule, in the very form proposed:* let the rates be excessive by ever so little, the schedule it is said, was to be rejected altogether, and no other could be substituted. In opposition the appellant [*Company*] urges that this is too narrow a construction of the function and powers of the Commission under the applicable statute: *if the proposed schedule was too high and the earlier one too low, there was a duty to fix a rate between, and thereby make the compensation adequate. We accept this broader view in the absence of a ruling to the contrary by the courts of the state.* (Emphasis added.)

The Commission and Association argue that the last sentence of Justice Cardozo's statement as set forth above precludes our consideration of this case as authority for the view expressed for the reason that the Supreme Court in this state expressly ruled "to the contrary" in the case of *Mountain States 1954,* supra. They misconstrue the holding in that case.

The New Mexico Supreme Court was construing the scope of review of the *Supreme Court* as opposed to the scope of the inquiry before the *Commission,* as here, where we are deciding the issue within the narrow confines of the authority delegated to the Commission by N.M.Const. art. 11, § 7. The court called specific attention to this distinction and stated (58 N.M. at 270, 270 P.2d at 691):

We do not decide finally the scope of the question before the commission because decision of that question is not required for disposition of this case.

■ The Commission has an ongoing, affirmative duty to establish rules and regulations, issue orders, examine records, conduct investigations, grant continuances and do all other things necessary to insure that the public has fair telephone rates and that the utility is fairly treated. Its role is not a passive one. *State v. Montana-Dakota Utilities Co.,* 89 N.W.2d 94 (N.D.1958); *Bennett v. Mountain States Telephone & Tel. Co.,* 121 Colo. 325, 215 P.2d 714 (1950); *Illinois Bell Telephone Co. v. Commerce Commission,* 304 Ill. 357, 136 N.E. 676 (1922).

As the Superior Court of Pennsylvania declared in *Pennsylvania Power & Light Co. v. Public Service Com'n,* 128 Pa.Super. 195, 217, 218, 193 A. 427, 437 (1937):

If . . . it is found that the rates are too high, *the commission must then necessarily either indicate a proper charge or furnish a basis which will enable the utility to file a proper tariff. Otherwise there would be no end to the controversy.*

. . .

We are all of the opinion that *we cannot perform the duty imposed* on us . . . *until the commission has completed its task by determining what, in its opinion,* are fair charges or proper tariffs. . . . (Emphasis added.)

See also *School Dist. No. 47 at Lakewood Sanitation Dist.,* 68 P.U.R. (N.S.) 385 (Colo. Pub.U.Com'n, 1947); *Milltown Mutual Telephone Co.,* 56 P.U.R. (N.S.) 125 (Wisc.Publ. Serv.Com'n, 1944); *Peoples Natural Gas Co. v. Pennsylvania Pub. U. Com'n,* 141 Pa.Super. 5, 14 A.2d 133 (1940); *Lewis & Dunn,* 8 P.U.R. (N.S.) 285 (Me.Pub.U.Com'n, 1934).

How do these general legal principles apply to the relevant facts in the case at hand?

■ The record reveals an unusual set of circumstances. The dominant issue concerning Mountain Bell was settled when the Commission ruled that the Company was entitled to $12,900,000 per year in additional revenue. This was the most critical part of the decision-making process; from there it simply became a question of how the increased revenue load was to be apportioned among the customers of Mountain Bell.

The evidence shows that traditionally and logically there is a great measure of public policy that enters into the apportionment of rates. It is incumbent upon the Commission to make public policy decisions and to change proposed rates that do not comport therewith.

The eighteen days of hearings and subsequent proceedings produced a monumental record of over seven thousand pages of testimony, exhibits and briefs, all of which have been reviewed by this court. The Company officials testified that they had presented to the Commission "all" of the evidence available to Mountain Bell bearing upon the fairness and reasonableness of the rates proposed and that they had supplied to the Commission all documents or information requested by the Commission. There was no complaint by the Commission as to failure on the part of Mountain Bell to supply any information or documents that were known to be available to the Company. There was no indication that the Commission desired additional proof. Mountain Bell made no request for time within which to furnish additional evidence.

It is obvious from the testimony that the complicated cost data that would have been required to meet the criticisms of the Association and the Commission would entail studies that would take a considerable amount of time to make or for which there were no known or tested procedures.

So, at the end of the hearings, the parties were at an impasse. The Commission, by its order, found "an absence of reliable cost information and a failure to prove that the proposed rates and charges are just and reasonable. . . . We are convinced that the absence of reliable cost and revenue data exists in the evidence offered to support each and every proposed rate or charge in every service category." The posture of Mountain Bell at that point was that it had supplied the Commission with every scrap of relevant evidence that could be obtained. The Commission denied the proposed increases as to all rates.

■ It is inherent in the Commission's constitutional mandate that it has the au-thority to refuse to fix telephone rates when it does not have substantial evidence from which fair rates can be reasonably calculated or determined. Under such circumstances the Commission has a duty to deny the rates. The Commission's findings and conclusions show that the members were exercising their prerogative, as they saw it, of denying the rates for the reason that there was no substantial evidence upon which they could act.

Thus, the Commission having fulfilled what it considered to be its duty, it devolves upon this court to examine the case "on the merits" as charged in the Constitution, look at the entire record and decide whether the decision of the Commission is just and reasonable and "should be enforced, or the contrary." *Mountain States 1954,* supra.

■■ We cannot hold that under all situations, without regard for the state of the evidence, the Commission has a duty to formulate rates. We cannot say as a matter of law that the rates submitted should have been approved. We do, however, hold that there was substantial evidence before the Commission that the rates were reasonable, or substantial evidence was present from which the Commission could have promulgated reasonable rates consistent with the Commission's discretion on public policy issues involved with regard to apportionment. Upon remand the Commission shall proceed to fix rates, having these legal principles in mind.

2. Mountain Bell claims that the New Mexico Constitution sets a maximum limit of six months within which the Commission must establish new rates. N.M.Const. art. 11, § 8 states that:

> . . . The Commission shall hear and decide applications . . . with reasonable promptness. If within six [6] months after having filed such an application the commission has not entered an order disposing of the matter, the company . . . may put the proposed change into effect.

■ We hold that the constitutional provision above cited is plain and definite

and free from ambiguity. The section plainly states that the Commission must act "with reasonable promptness." The six months' provision does not make it mandatory upon the Commission to act within six months but simply says that if the Commission does not act the utility may put the proposed rates into effect. The plain and ordinary sense of the words used make the clause free from ambiguity and thus not susceptible to construction. *Flaska v. State,* 51 N.M. 13, 177 P.2d 174 (1946).

3. Mountain Bell contends that failure of the Commission to allow its basic exchange rates to go into effect under bond after its petition so requesting was filed on August 11, 1975, amounted to an unconstitutional confiscation of the Company's property.

Mountain Bell argues that the finding of the Commission that the utility was suffering a serious revenue deficiency triggered the Commission's constitutional duty to act to prevent confiscation of the Company's property because of inadequate rates. It is alleged that when rates are established at so low a level that operating costs cannot be recovered, the Commission is taking the Company's property without just compensation.

 It is a well-established principle that private property may not be taken for public use without just compensation. U.S. Const. amends. V and XIV; N.M.Const. art. 2, § 20. Obviously, a fair rate of return is one that is compensable. The failure of a regulatory commission to provide for rates that will provide a reasonable rate of return therefore constituted a violation of due process. *West v. C. & P. Tel. Co.,* 295 U.S. 662, 55 S.Ct. 894, 79 L.Ed. 1640 (1935); *Northwestern Bell Telephone Co.,* 69 S.D. 36, 6 N.W.2d 165, 46 P.U.R. (N.S.) 293 (1942).

The authority granted to the Commission is so broad that little room is left for construction. In *San Juan C. & C. Co. v. S. F., S. J. & N. Ry. Co.,* 35 N.M. 512, 516–517, 2 P.2d 305, 307 (1931) this court discussed the extent of the Commission's authority:

If the commission were a creature of the Legislature, we should construe its powers with some strictness. Such powers as the Legislature had not conferred or delegated, it would be deemed to have reserved. Even so, the language of the grant is here so all-inclusive that good reason for limiting it has not occurred to us.

But this is not a legislative grant. It is a delegation of power and duty by the Constitution. *The power to fix rates is an attribute of sovereignty.* The people, in framing their fundamental law, considered where they would place it. It is legislative in its nature, and, if the people had not spoken, rate making would have devolved upon the Legislature as one of its natural and inherent concerns. But they did speak. It is clear to us that they intended the corporation commission to have all the power and the Legislature to have none of it. . . .

*We consider the rate-making power of the commission to be plenary,* except as restricted by those principles of constitutional law which would have limited its exercise if it had been intrusted to the Legislature. (Emphasis added.)

See also *Meana v. Morrison,* 28 Ill.App.3d 849, 329 N.E.2d 535 (1975); *In re Promulgation of Rules of Practice,* 132 N.J.Super. 45, 332 A.2d 209 (1974); *State v. Mountain States Tel. & Tel. Co.,* 54 N.M. 315, 224 P.2d 155 (1950).

Mountain Bell's proof showed that in 1973 the Commission allowed the Company a minimum rate of return on common equity of 11.7%, but this return was never realized. In 1973, the actual rate was 8.87%, in 1974, 8.13% and in the first quarter of 1975, 6.41%. The Commission's order of July 9, 1975, in this hearing authorized a rate of return of 11.7% which necessarily meant that the Company was losing over a million dollars each month from what had been established by the Commission to be a fair rate of return.

It takes no intricate process of reasoning or calculation to arrive at the conclusion that, at the point when it became obvious

that the decision of the Commission would be delayed and the Company would suffer irreparable loss of revenue in the interim, failure to increase the rates was an unconstitutional confiscation of the Company's property without due process of law.

Many states have either constitutional provisions or statutes, or both, which specifically authorize the regulatory body charged with the responsibility of fixing rates to institute interim rates in cases of emergency, or where the decision on permanent rates would be likely to take such a length of time that it would work a hardship on the utility. Other states that do not have constitutional provisions or statutes granting this power have held that their commissions have the implied right to exercise the authority under proper circumstances.

The conditions under which the courts have felt that this authority has been properly exercised have been generally the same, whether the authority is given by law or is impliedly within the power of the regulatory agency. Generally, the rationale for the existence of the relief has been held to be the same in each of the categories of cases that have found their way into the books. It is logical and reasonable that presence or absence of a law permitting the relief should not be controlling.

Cases from our neighboring state of Arizona have addressed this problem. In *Arizona Corp. Com'n v. Mountain States Tel. & Tel. Co.,* 71 Ariz. 404, 228 P.2d 749 (1951) the Arizona Commission had refused interim rates while permanent rates were being litigated. The court called attention to the fact that nine months had elapsed in which the Commission had not put into effect a schedule of rates that would not be confiscatory, "evidencing a callous disregard of their duty, to the company's financial detriment." The court further found that, although there was no specific authority in the constitution or statutes for the Arizona Supreme Court to fix temporary rates, the proper remedy was for that court to allow the company to fix and collect a temporary rate on giving proper security.

Under similar circumstances, the Florida Supreme Court found that, when the telephone company alleged that its rate of return was below that approved by the commission as the minimum rate, it made out a prima facie case requiring the commission to approve an interim rate increase so long as the increase would not bring the rate of return above the previously-approved minimum. The court declared that "any rate of return below the authorized minimum must, of necessity, be unfair, unjust, unreasonable and insufficient." *Southern Bell Telephone & Telegraph Co. v. Bevis,* 279 So.2d 285, 286 (Fla.1973). See also: *Coplay Cement Mfg. Co. v. Public Service Commission,* 271 Pa. 58, 114 A. 649 (1921); *S. Central Bell v. Tennessee Pub. Serv. Comm.,* 10 P.U.R. 4th 72 (Tenn.Chanc.Ct.1975).

In *Pacific Teleph. & Teleg. Co.,* 78 P.U.R. (N.S.) 491, 493 (Cal.Pub.U.Com'n 1949), the commission stated:

It is an elementary rule of law that the power to grant a particular relief carries with it all the incidental, necessary, and reasonable authority to grant that which is less. It is apparent that the authority delegated to this Commission by the Public Utilities Act to award rate relief to a public utility carries with it the incidental and implied power to grant interim rate relief, if the facts warrant such summary relief. . . .

The Commission in this case had already determined that Mountain Bell was losing over one million dollars per month considering what had been determined to be its fair rate of return. In compliance with the Commission's desires, Mountain Bell had presented great volumes of cost-of-service evidence regarding the basic exchange rates.

In its petition of August 11, 1975, for interim rates, the Company did not request that new rates be set on all its services. It asked that the proposed basic exchange rates which had been "cost justified . . by evidence showing that exchange rates are not sufficient to cover the direct cost of exchange service" be placed into effect under bond. The granting of the motion

would not have permitted the Company to earn the full rate of return that the Commission had found was needed but would have reduced the losses to some degree.

The Commission refused to grant interim rates stating that the rate structure should be established as a whole and that the Commission had not heard cross-examination on the proposed rates. It was further claimed that the granting of interim rates might have the effect of encouraging incomplete presentations by Mountain Bell in the future. These arguments are not persuasive.

■■■ We hold that the Commission, when it had found that the rates of Mountain Bell were not fair and reasonable and when it became obvious that it would be a considerable length of time before permanent rates could be fixed, had a constitutional duty to fix interim rates that would minimize the confiscation of Mountain Bell's property. The fourteenth amendment to the United States Constitution and article 2, § 20 of the New Mexico Constitution prohibiting public confiscation of private property without just compensation made it the imperative duty of the commission to provide adequately for temporary rates.

■■■ The authority to grant the rates under bond, as a lawful and necessary adjunct to the effectual exercise of the power to fix interim rates, is given by implication of law. *Wimberly v. New Mexico State Police Board,* 83 N.M. 757, 497 P.2d 968 (1972).

4. The Commission contends that Mountain Bell failed to meet its burden of proof.

The New Mexico Constitution provides that the utility company has the burden of proof to show that the proposed rates are "just and reasonable," and that the Commission is to give "due consideration" to "earnings, investment and expenditure as a whole within the state" in their promulgation. N.M.Const. art. 11, §§ 7, 8.

The Commission in its decision and order No. 274(c) in this case dated January 12, 1976, denied all requested changes and stated that ". . . *the* acceptable form of

proof is cost data." (Emphasis added.) It further found that there was an absence of reliable cost data to support each and every proposed rate.

Mountain Bell objects to the decision of the Commission because it considered only cost data in determining whether the utility had met its burden of proof and claims that this constitutes a holding that only cost data may be considered in determining whether the rates are just and reasonable.

The above decision of January 12 and the entire record reflect that the Commission was determined to develop cost-of-service data for each of the services rendered by Mountain Bell. Heavy reliance was placed upon the order of the Commission of 1973 in the Mountain Bell rate case. *Mountain States Teleph. & Teleg. Co.,* 2 P.U.R. 4th 332, 356–359 (N.M.State Corp. Com'n 1973).

In that order the Commission analyzed the traditional methods of determining rates for a particular telephone service. It recognized that the circumstances involving common plant and equipment "make it extremely difficult" to allocate costs by type and quantity of service and that the cost allocations are largely dependent upon "informed judgment;" but observed that this method might not be as arbitrary as the traditional "value of service pricing theory," employed in part by Mountain Bell in this case. The order provided (2 P.U.R. 4th at 359):

Nevertheless, it is our declared intention to move toward this principle of pricing insofar as it proves possible and feasible and to require the applicant, in the future, to present definitive cost justification for its proposed new rates, together with cost justification for services for which new rates are not requested, where all such services are supplied through use of common plant, equipment, and personnel. . . . [O]ur intention is to grant those rate increases justified by the applicant on the basis of cost, to deny those which were not, to eliminate differentials which appeared to have no rational justification . . .

The Commission claims that this order was adequate notice to Mountain Bell that cost-of-service evidence would be required as to all services. Mountain Bell contends that the order of 1973 fails to notify the Company as to the form and nature of the cost data it would require, and that when the Commission in this case adopted cost-of-service evidence as the single factor for consideration, it denied Mountain Bell due process of law as guaranteed by the United States and the New Mexico constitutions.

This point calls for discussion of the historical background regarding techniques used in developing telephone rates over a period of many years.

Witnesses testified that for seventy to eighty years prior to 1969, there was a generally consistent policy throughout the United States whereby regulatory commissions established telephone rates by looking at costs and revenues on a statewide basis. The regulatory bodies did not require that the costs of operating the various exchanges throughout a state or the costs of providing each individual service be broken down and itemized. In fact, the Uniform Accounting System made mandatory by rule of the Federal Communications Commission for all utilities that operate in interstate commerce does not even now require the keeping of accounts in such a manner that this type of information can be readily ascertained.

The testimony was to the effect that greater reliance has been placed upon the presentation of cost-of-service data since the year 1969 when an anti-trust suit was filed against AT&T in which it was alleged that the rates being charged for residence and business phones were subsidizing the departments that sold equipment and services in competition with other firms. It became necessary for the company to itemize the costs of these competitive services for use in avoiding anti-trusts actions. As this information became available, the regulatory commissions began requiring additional cost studies for other services. The New Mexico Commission's order of 1973 reflected this trend.

Mountain Bell showed that since 1970 it has made great strides in devising methods of producing cost data for many services. According to Mountain Bell's witnesses, a full-time staff of twenty persons with the help of hundreds of other Bell employees with probably thousands of years of collective experience assembled as much cost information as could be made available to Commission.

The complexity of telephone rate-making is compounded by the fact that common plants and equipment and personnel are employed to furnish virtually all the separate types of telephone service. Allocation of the costs of construction and maintenance of a single telephone pole among the four thousand different services that the Company renders exemplifies the problem.

In the area of interstate telephone service, the FCC and various state regulatory systems have developed certain "arbitrary" methods of allocating the revenues and expenses as between interstate and intrastate operations. These are called "separation procedures." These methods have not been generally used to allocate costs among various intrastate services. Other methods have been devised to attempt to assure that there is reasonable justification for the rate that is charged for each service.

In New Mexico the Commission has adopted an approach which combines "value of service" and "cost of service." In some types of services the cost is reasonably determinable. In others the data has not been available from which reasonably accurate costs could be developed. Even where precise costs are determined, as well as where the costs of service are only estimated, the Commission has consistently ignored the cost data in apportioning the rates and has fixed the rates so that residential customers, small exchange users and rural customers are subsidized by charging much higher rates for other services. Witnesses of Mountain Bell testified that residential customers were paying only approximately sixty percent of the actual estimated cost of providing the service under the present

rates. Determining the level of subsidies, if any, is a Commission function.

This deviation from charging the customer on the basis of "cost of service" has been justified by the Commission on the grounds of "public policy" and on the theory that some subscribers receive more value from having a telephone. The businessman's telephone makes a profit for him. The fact that there are residential phones is of value to businesses, since the more residential connections there are the more commercial value is received. In smaller exchanges fewer people can be called, thus less value is received. This type of reasoning has supported the utilization of "value of service pricing" as an important factor in rate-making.

The development of "cost-of-service" data has other complex ramifications. The goal has not been reached by simply looking back at Mountain Bell's books and determining what is revealed therein about past costs. This is just the starting point. As is common, a future test year was established, in our case the year 1975, for which there are no available cost figures since the rate case was filed in April of that year. All the various revenues and costs of past years must be analyzed and projected to estimate costs and revenues that may be expected to accrue in the test year. Then one must estimate what each of the proposed new rates will add to the revenues, the projected decrease in service because of the increased rate, the decrease in the cost of the service because of the decrease in persons using the service, the effect of inflation, the market considerations on competitive items, the cost of money, and a multiplicity of other factors.

The end result of the machinations is not a determination of the actual cost of any given service. Use of the term "cost of service" is an over-simplification. At best, the result represents an educated guess as to what the costs may be in the test year. It cannot be dignified by being considered a factual determination. It is tenuous expert opinion, or informed-judgment evidence, based upon extremely complex and elusive information.

■ It is clear from this record and from the nature of this complex business that there is no way of learning precisely what it will cost to render any particular service. *King v. Pacific Teleph. & Teleg. Co.*, 16 P.U.R. (N.S.) 348 (Oregon Pub. U. Com'nr 1936). Relating each customer's rate to the actual cost of the service rendered to him, even if such cost were susceptible of ascertainment, would be highly impractical for it would lead to a multitude of varying rates. It is for these reasons that telephone rates must be developed on a trial-and-error basis with due consideration to the relative value of each service, as well as cost data. · *Morris v. New Jersey Bell Teleph. Co.*, 6 P.U.R. (N.S.) 258 (N.J. Bd. of Pub. U. Com'nrs 1934). Under some circumstances value of service may be entitled to more weight than an estimate of cost-of-service, which necessarily involves many allocations on a more or less arbitrary basis. *Wisconsin Telephone Co.*, 22 P.U.R. (N.S.) 220 (Wisc. Pub. Serv. Com'n 1937).

■ The Commission was not bound to the use of any single formula or combination of formulae in determining rates. The rate-making function involves the making of pragmatic adjustments. It is the result reached, not the method employed, which is controlling. *Power Comm'n v. Hope Gas. Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944); *Power Comm'n v. Pipeline Co.*, 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037 (1942).

In *Mountain States 1954*, supra, Justice Seymour analyzed the various formulae used in rate cases in the past to determine the revenue requirements of utilities and stated (58 N.M. at 272, 273, 270 P. 2d at 693):

This Court can see no reason why it should adopt as the law of this state any single formula which has been evolved out of this history of litigation . . . Obviously, no single formula can be achieved which will successfully meet the varying needs of different economic levels.

■ The same can be said with regard to development of rate schedules. The Commission has a constitutional mandate to consider the Company's earnings, investments and expenditures as a whole within the state in promulgating rates. The Commission is not confined solely to the cost-of-service formula, nor can it impose this single criterion on Mountain Bell under the circumstances here.

■ In *Chesapeake & Potomac Telep. Co.*, 90 P.U.R.3d 314, 316 (D.C. Pub. Serv. Com'n 1972) the commission said:

. . . it has long been recognized that *costs are not the sole* criterion to be used in the fixing of the rates to be charged for particular utility services. To the contrary, such factors as history and value of service also play an important role in the determining of such rates. (Emphasis added.)

Other courts have approved various types of evidence that merit consideration, such as cost of service, value of service, existence of competition, characteristics of the commodity, anticipated volume of use, economic status of the industry served, comparison with other rates in other geographic areas, size of exchanges, permissible calling distances, subscriber density, usage, calling characteristics, specific and relative rate levels, station availability, and relative exchange earnings. *Westinghouse Electric Corporation v. United States*, 388 F.Supp. 1309 (W.D.Pa.1975); *Scranton Steam Heat Co. v. Pennsylvania Pub. U. Com'n*, 194 Pa.Super. 143, 167 A.2d 693 (1960); *General Teleph. Co. of California*, 25 P.U.R.3d 129 (Cal. Pub. U. Com'n 1958). Extreme nicety in the allocation is not required, but only reasonable measures are necessary. *Iowa-Illinois Gas & Electric Co. v. City of Fort Dodge*, 248 Iowa 1201, 85 N.W.2d 28 (1957); *Smith v. Illinois Bell Tel. Co.*, 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255 (1930).

■ If the Commission did not consider cost-of-service evidence as the sole criterion in this case, it is evident that it gave overwhelming credence to the formula in appraising the evidence submitted. The task facing the Commission at this point was to allocate the $12,900,000 increase among the various customers of Mountain Bell. With this in mind we hold that there is substantial evidence in the record to support the reasonableness of the proposed rates by standards that have been used by the Commission for many years past. There was a great deal of evidence presented (allegedly all that could reasonably be obtained) by Mountain Bell in the nature of cost-of-service data as requested by the Commission. Although there was contrary evidence submitted by the Association as to some rates, the court finds that there is substantial evidence in the record from which the Commission should have fixed rates after it disagreed with the manner in which apportionment was handled in the proposed rate schedule.

■ We hold that it was error under these circumstances for the Commission, having refused to accept the rates filed by the Company, to decline to fix rates which would be just and reasonable.

■ In light of the Commission's views on problems of allocation, Mountain Bell contends that, even if a cost-of-service formula may be required by the Commission, the Company was not given adequate notice as to the nearly-exclusive extent to which the doctrine would be applied and was not apprised of the nature of the evidence that the Commission would demand. The complaint is a legitimate one.

The 1973 order is far from clear. It says that the Commission has an intention "to move toward this principle of pricing." It does not say the formula has been definitely adopted. The order says that the Commission will move toward this principle "as it proves possible and feasible." There are no standards from which it can be determined what is possible or feasible. These matters are to be required "in the future," but no reference is made to a specific deadline. The applicant will be required to present "definitive cost justification," with no enunciation of the means by which the costs are to be justified. The order is vague and ambiguous on the vital point at issue.

The Association's expert found it essential and recommended to the Commission that special hearings should be held in the future to promulgate guidelines as to the types of cost evidence that are to be required and the methods to be employed in their development. Other regulatory bodies have used this procedure or plan to do so.

■ For an order of the Commission to be valid, binding and enforceable, it must be reasonably definite in its terms and requirements. *Seward v. D.R.G.R. Company*, 17 N.M. 557, 131 P. 980 (1913).

It is one of the cardinal principles of constitutional law that a statute (or, by logical extension, an administrative order)

. . . which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law.

*Connally v. General Const. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). See also *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Williams v. Board of Dir. of Endicott Sch. Dist. 308*, 10 Wash.App. 579, 519 P.2d 15 (1974); *Lone Star Gas Co. v. Kelly*, 140 Tex. 15, 165 S.W.2d 446 (1942). According to this test, it becomes apparent that the lack of specificity in the 1973 order combined with the great weight placed by the Commission on the cost-of-service formula constituted a deprivation of Mountain Bell's property without due process of law.

5. In its final point Mountain Bell asserts that it is entitled to have the Commission instructed that the most recent economic data available must be considered and urges that the Commission be ordered to promulgate permanent rates that will provide the Company with the level of revenue to which it was entitled as of January 14, 1976.

This court has previously criticized the Commission for failure to use the "latest available actual figures" and asserted that the determination of rates "depends upon the economic facts relevant at the time of decision." *Mountain States 1954*, supra, 58 N.M. at 276–278, 270 P.2d at 696. The court further stated in that case that it was error to use a past historical test year, as would be the case here if the year 1975 were employed as the test year at this time.

Quite obviously the most recent figures would be the most reliable in determining adequate utility rates. This case has been in progress since April of 1975, a period of almost twenty-four months. It would be unreasonable to ignore the actual experience during that period of time in arriving at new rates.

■ Common sense requires that the latest available economic information should be utilized in order to insure that the projected figures bear a meaningful relation to future as well as past and present fiscal realities. See *General Telephone Co. v. Michigan Public Serv. Com'n*, 341 Mich. 620, 67 N.W.2d 882 (1954); *Tampa Electric Co.*, 92 P.U.R.3d 398 (Fla. Pub. Serv. Com'n 1971).

We hold that the Commission shall take into consideration the most recent figures available after this matter comes under its jurisdiction again.

Mountain Bell also argues that the Company's revenue deficiency should be remedied by this court ordering the Commission to make the rates retroactive to January 14, 1976. On August 11, 1976, our court ordered that the rates applied for be made effective. Thus, the loss of revenue about which Mountain Bell is complaining occurred over a period of approximately six months.

The contention is that this represents the cut-off date of the six-months' limitation contained in the stipulation of the parties, and based on the constitutional provision, and the date on which Mountain Bell claims that it was mandatory for the Commission to fix rates. We have already ruled that the six-months' clause does not make it mandatory that rates be fixed within the prescribed period, without regard for the state of the evidence.

██ This is an issue of first impression in New Mexico. However, this court has held that rate-making is legislative in its nature, *San Juan C. & C. Co. v. S.F., S.J. & N. Ry. Co.*, supra, and it is axiomatic that legislative action operates prospectively, not retroactively. Retroactive remedies, which are in the nature of reparations rather than rate-making, are peculiarly judicial in character, and as such are beyond the authority of the Commission to grant. See *Pacific Telephone & Tel. Co. v. Public Utilities Com', 62 Cal.2d 634, 44 Cal.Rptr. 1, 401 P.2d 353 (1965); Southern Pac. Co. v. Railroad Commission, 194 Cal. 734, 231 P. 28 (1924).

Moreover,

[t]here is no better established rule with regard to the prescription of rates for a public utility than the one that holds that rate fixing may not be accomplished retroactively, unless some specific statutory or constitutional authority permits. Past deficits may not be made up by excessive charges in the future nor may past profits be reduced by disallowances to future operating expense.

*Pacific Teleph. & Teleg. Co.*, 80 P.U.R. (N.S.) 355, 369 (Calif. Pub. U. Com'n 1949). In accord are *Williams v. Washington Metropolitan Area Transit Com'n*, 134 U.S.App. D.C. 342, 415 F.2d 922 (1968), cert. denied, 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1949); *Michigan Bell Tel. Co. v. Michigan Pub. Serv. Com'n*, 315 Mich. 533, 24 N.W.2d 200 (1946). See also *T.W.A. v. Civil Aeronautics Board*, 336 U.S. 601, 69 S.Ct. 756, 93 L.Ed. 912 (1949); *Public Utilities Comm'n v. Gas Co.*, 317 U.S. 456, 63 S.Ct. 369, 87 L.Ed. 396 (1943); *United States v. N.Y. Central*, 279 U.S. 73, 49 S.Ct. 260, 73 L.Ed. 619 (1929).

██ Accordingly, since, first, the Commission's authority is legislative and therefore limited generally to prospective regulation and, second, neither the applicable constitutional provisions nor the pertinent statutes, previously discussed at length, provide the requisite specific permission to make rates retroactive, the rates fixed by the Commission will apply prospectively only.

In its cross-appeal the Association claims that the Commission committed error in refusing to reduce the PBX and Centrex trunk rate differentials from 1.75 to 1.50 times the single business line rate. The Association contends that there is substantial evidence in the record in support of this reduction in the rates that were already in effect prior to this hearing. Mountain Bell made application for a differential of 1.875, which was also refused in Order No. 3274(c).

As previously enunciated in this opinion, this court does not promulgate rates. *Mountain States 1954*, supra. Our function is to determine whether rates fixed by the Commission are just and reasonable. Until the Commission acts to fix rates in these two categories, we cannot exercise that function. Furthermore, there is substantial evidence in the record to support the Commission's denial of the requested relief. We affirm that denial.

The Supreme Court's order of the 13th day of July, 1976, fixed interim rates to be in force under bond for one year beginning on July 14, 1976. Since this court finds that there is substantial evidence in the record to show that these rates are just and reasonable, there is no necessity that a bond be provided. The new rates that are now in force shall continue until further order of the Commission or further order of this court. No bond shall be required.

This cause is remanded to the Commission for action not inconsistent herewith.

IT IS SO ORDERED.

McMANUS, C. J., SOSA and PAYNE, JJ., and WILLIAM F. RIORDAN, District Judge, concur.